## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN AMOS SMALL, | : | Civil No. 3:09-cv-02023 |
| | : | |
| Petitioner, | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | **THIS IS A CAPITAL CASE** |
| LAUREL HARRY, Secretary, | : | |
| Pennsylvania Department of | : | |
| Corrections; JOSEPH TERRA, | : | |
| Superintendent of the State | : | |
| Correctional Institution at Phoenix; | : | |
| and BOBBI SALAMON, Superintendent | : | |
| of the State Correctional Institution | : | |
| at Rockview,[1] | : | |
| | : | |
| Respondents. | : | |

FILED
SCRANTON
MAY 15 2025
PER _____
DEPUTY CLERK

## MEMORANDUM

Petitioner John Amos Small filed the instant petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254 (Doc. 1), as supplemented (Doc. 94-2), seeking relief from his

convictions and death sentence imposed in the Court of Common Pleas of York County,

Pennsylvania. For the reasons set forth below, the Court will deny the petition.

---

[1] At the time he filed his petition, Petitioner was incarcerated at the State Correctional Institution ("SCI") at Greene and therefore named its superintendent, Louis B. Folino, as a respondent. According to the Pennsylvania Department of Corrections Inmate Locator at https://inmatelocator.cor.pa.gov/#/, Petitioner is currently incarcerated at SCI Phoenix. Accordingly, Joseph Terra, the Superintendent of SCI Phoenix, is substituted for Louis B. Folino as the officer with current custody of Petitioner. *See* Rules Governing Section 2254 Cases, Rule 2(b). In addition, pursuant to Federal Rule of Civil Procedure 25(d), Laurel Harry, the current Secretary of the Pennsylvania Department of Corrections, is substituted for Jeffrey A. Beard, and Bobbi Salamon, the current Superintendent of SCI Rockview, is substituted for Franklin J. Tennis. The Court will use "the Commonwealth" to refer collectively to the respondents.

I.    **PROCEDURAL HISTORY**

Following a jury trial in May 1996, Petitioner was convicted of first-degree murder and attempted rape in connection with the 1981 death of Cheryl Smith. *Commonwealth v. Small*, 741 A.2d 666, 670 (Pa. 1999) ("*Small-I*"). The jury returned a death sentence following a penalty phase hearing at which Petitioner instructed his counsel, York County Public Defender R. Bruce Evanick and assistant public defender Robert O'Brien, not to present mitigation. *Id.* at 670 n.4; (Doc. 1 ¶¶ 4, 141). On June 19, 1996, the trial court, the Honorable Emanuel A. Cassimatis, imposed the death sentence for the first-degree murder conviction and an aggregate term of five to ten years imprisonment for the attempted rape conviction. *Small-I*, 741 A.2d at 670-71.

O'Brien continued to represent Petitioner on direct appeal. (Doc. 1 ¶ 4). On November 1, 1999, the Pennsylvania Supreme Court affirmed Petitioner's convictions and death sentence. *Small-I*, 741 A.2d at 671. On October 2, 2000, the United States Supreme Court denied Petitioner's petition for a writ of certiorari. *Small v. Pennsylvania*, 531 U.S. 829 (2000).

On August 31, 2001, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See Small v. Beard*, No. 3:01-cv-00210, Doc. 14 (M.D. Pa.). On September 13, 2001, the Court dismissed the petition without prejudice to permit Petitioner to exhaust his remedies in state court. *See id.,* Doc. 18.

On September 18, 2001, Petitioner filed a petition pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 PA. CONST. STAT. §§ 9541-46, followed by an amended PCRA petition on October 1, 2001. (*See* Doc. 80-1 at 2; *Commonwealth v. Small*, No. 2844 C.A. 1995, Amended Petition ("PCRA Amend. Pet.")). Represented by his present counsel, Petitioner challenged his convictions and death sentence on numerous grounds, including that his prior counsel were ineffective and that he did not validly waive his right to present mitigation in the penalty phase of his trial. (*See id.*). At the direction of the PCRA court, Petitioner proffered the facts he sought to prove in an evidentiary hearing. (*Commonwealth v. Small*, No. 2844 C.A. 1995, Petitioner's Proffer (Feb. 18, 2004) ("PCRA Proffer")).

In February 2004, the PCRA court held a three-day evidentiary hearing to address the validity of Petitioner's waiver of mitigation at the penalty phase. The Commonwealth subsequently filed a motion to dismiss, which the PCRA court granted in part on July 8, 2004, dismissing 372 of the 397 paragraphs of the amended PCRA petition as waived or previously decided. *See Commonwealth v. Small*, 980 A.2d 549, 557 (Pa. 2009) ("*Small-II*"); (Doc. 115-5 at 148; Doc. 80-1 at 4, 6-7). On July 15, 2004, the PCRA court found that Petitioner validly waived his right to present mitigating evidence and that his counsel were not ineffective in following his instructions not to present mitigating evidence. (Doc. 115-5 at 146). The PCRA court held a five-day evidentiary hearing in July 2004 on the remaining 25 paragraphs of the amended PCRA petition. In a decision issued on December 16, 2004, the PCRA court found that Petitioner's trial counsel were ineffective in

three respects, granted Petitioner a new trial, and denied relief on the remaining claims. (Doc. 80-1 at 11, 19, 21-24, 27-28, 31, 33-34). On October 5, 2009, the Pennsylvania Supreme Court reversed the PCRA court's decision to grant a new trial and denied relief on all claims. *Small-II*, 980 A.2d at 579.

On October 17, 2009, Petitioner filed the instant petition for a writ of habeas corpus. (Doc. 1). On November 16, 2009, the Court granted Petitioner's unopposed motion for a stay of execution. (Doc. 12). Thereafter, Petitioner filed an appendix and memorandum of law in support of the petition, the Commonwealth filed its response, Petitioner filed a reply, and the parties filed supplemental memoranda of law. (Docs. 26, 36, 50, 61, 65, 70).

On October 3, 2014, the Court granted in part Petitioner's motion for discovery. (Doc. 84). On January 7, 2015, Petitioner filed a successor PCRA petition, seeking relief based on a newly discovered witness statement produced in the discovery. (Doc. 97-1). On July 14, 2015, the Court granted Petitioner leave to file a supplement to the instant petition to add factual allegations based on information produced in discovery. (Docs. 95, 94-2). The Commonwealth filed its response to the supplement on August 14, 2015. (Doc. 98). Petitioner filed a reply on August 28, 2015. (Doc. 99).

On September 25, 2015, the Court stayed the instant proceedings pending final disposition of the successor PCRA petition in state court. (Doc. 101). On March 21, 2024, the Pennsylvania Supreme Court denied relief on the successor PCRA petition. *Commonwealth v. Small*, 315 A.3d 831 (Pa. 2024) ("*Small-III*"). On May 1, 2024, the Court

4

granted Petitioner's unopposed motion to reactivate the instant proceedings. (Doc. 106).

The parties thereafter filed supplemental briefs. (Docs. 112, 118). The petition, as

supplemented (Docs. 1, 94-2), is now ripe for disposition.

## II.    FACTUAL BACKGROUND

On August 19, 1981, Smith's father made a missing person report, indicating that his

daughter had been missing since August 5, 1981. (Notes of Testimony ("NT") Trial at

1216:25-1217:4). On September 15, 1981, a hunter found Smith's partially decomposed

body in a wooded area off Kreidler's Schoolhouse Road, a dirt road near the border

between Pennsylvania and Maryland. (*Id.* at 116:16-118:22). The body was nude from the

chest down, with the legs in a spread-eagle position, and a pink sweatshirt and T-shirt were

rolled loosely up around the neck. (*Id.* at 186:16-18, 187:5-6). Skull fractures on the right

and left sides were determined to be the cause of death in an autopsy performed by Dr.

Marvin Aronson. (*Id.* at 617:1-13, 629:6-13). Aronson could not determine the time of

death or whether any sexual activity had taken place. (*Id.* at 634:18-22, 635:4-7).

Police questioned 60 to 80 witnesses in the year after Smith's body was found,

focusing on other people who associated with her. (*Id.* at 171:8-172:6, 22-24). However,

the crime remained unsolved until 1995, when police developed evidence that Smith was

last seen in August 1981 with a group of young people in an area known as "the Pines,"

near where her body was found. Four individuals were charged with Smith's murder:

Petitioner, his brother, Charles Small, James Frey, and Larry Tucker. Tucker's case was severed after he agreed to testify for the Commonwealth. *Small-I*, 741 A.2d at 671 n.5.

The Commonwealth's theory at trial was that Petitioner, Charles Small, and Frey attempted to rape Smith and then killed her at the Pines on the night of August 5-6, 1981. (NT Trial at 62:23-67:22). The Commonwealth presented five witnesses who described what they observed that night: Tucker, James "Smitty" Hughes ("Smitty"), Cerenna Hughes ("Cerenna"), Mary Trish, and Michelle Starling.

Tucker was the Commonwealth's primary witness. Tucker acknowledged that he had been charged with Smith's murder and was testifying pursuant to a plea agreement. (*Id.* at 637:15-23). Under that agreement, in exchange for his truthful testimony, Tucker would face a sentence of no more than 10 to 20 years for third-degree murder, with the possibility of lesser charges or the charges being dropped entirely. (*Id.* at 637:24-638:5).

Tucker testified that he began the evening of August 5, 1981, at a party at the home of Brian Herman in Hanover, Pennsylvania. (*Id.* at 639:4-9). Smith, who Tucker was dating at the time, was also at the party. (*Id.* at 640:19-641:7). Tucker consumed alcohol and marijuana before and during the party and at some point got into a fight with his brother, Andy Tucker. (*Id.* at 639:22-25, 640:8-14, 674:23-24, 675:4-6, 676:20-678:11). Tucker could not recall what the fight was about but denied that it was about Smith. (*Id.* at 675:8-11). Tucker did not recall when, how, or with whom he left the party. (*Id.* at 641:16-642:1). At some point, he left Hanover in a car with Smith, Petitioner, Trish, Smitty

6

and Frey, whose nickname was "the Governor." (*Id.* at 642:2-14, 25, 643:1, 8-10).  The

group stopped in a wooded area because Smith needed to urinate and Trish got sick.  (*Id.*

at 643:11-21).  A second car was also there, occupied by Cerenna, Starling, and Mitch

Trivitt.  (*Id.* at 645:16-20).

Tucker observed Smith go into the woods, followed by Petitioner and Frey.  (*Id.* at

645:21-646:3).  Tucker then heard Smith screaming and ran into the woods to see what was

happening.  (*Id.* at 646:6-13, 22-25, 647:1-2).  Tucker saw Petitioner throw Smith to the

ground, then she got up, and Frey threw her back to the ground.  (*Id.* at 647:7-10).

Although Smith at that point was not hurt and had her clothes on, Tucker believed that

Petitioner and Frey were going to rape her.  (*Id.* at 648:6-13, 16-18).  When Tucker asked

what was going on, their answer was that if he said anything about what he saw or heard

they would kill him and his family.  (*Id.* at 647:10-13).  Tucker also recalled Petitioner and

Frey saying, "you give it to everybody else." (*Id.* at 647:15-19).  Tucker ran back to the car,

where only Smitty and Trish remained, as the second car had left before Tucker went into

the woods.  (*Id.* at 648:19-20, 24-25, 649:4-9).  Tucker then observed Petitioner come out of

the woods with blood on his hands, followed about five minutes later by Frey.  (*Id.* at

649:17-650:11).  Petitioner and Frey did not say anything to Tucker, and the group got into

the car and left.  (*Id.* at 650:12-25).  Tucker did not recall Charles Small being part of the

group.  (*Id.* at 651:4-7).  Tucker never saw Smith again.  (*Id.* at 651:8-10)

On cross-examination, Tucker testified that he believed that he had a greater chance of a better outcome under his plea agreement if the other defendants were convicted. (*Id.* at 673:18-21). Tucker acknowledged that he could not recall how he hooked up with the group that ended up at the Pines and or whether he went to the Melrose Tavern. (*Id.* at 674:1-2, 675:18-21). Tucker admitted that he had lied to the police in the course of the investigation of Smith's murder, including by saying that she was no longer his girlfriend at the time of her death and denying that Frey was involved in Smith's death. (*Id.* at 681:13-682:1, 684:6-18).

Smitty was the only other witness at the Pines who had knowledge of Smith being assaulted. Smitty testified that he left the Herman party and rode with Cerenna, Starling, and Trivitt to the Melrose Tavern and then to the Pines. (*Id.* at 547:20-549:6). They were accompanied by a second car occupied by Petitioner, Frey, Tucker, Smith, and Trish. (*Id.* at 549:7-9, 14-16). At the Pines, Smitty observed Petitioner, Frey, Tucker and Smith go into the woods. (*Id.* at 552:2-8, 25, 553:1-2, 19-21). Smitty at some point heard a female screaming but could make out no words. (*Id.* at 553:22-554:17). After that, Smitty observed Petitioner, Frey, and Tucker return to the car without Smith. (*Id.* at 555:18-556:2). Smitty left the Pines with the group and never saw Smith again. (*Id.* at 557:16-24). Smitty maintained that he did not recall Charles Small being at the Pines, despite having testified at the preliminary hearing that Charles Small was at the Pines and in the group that followed

Smith into the woods and returned without her. (*Id.* at 550:24-551:16, 552:5-8, 25, 553:1-12, 555:21-556:4, 25, 557:1-7, 13-15).

On cross-examination, Smitty testified that he may have been drunk at the Herman party and would have remembered nothing of the night at the Pines if asked to describe it the next morning. (*Id.* at 558:24-559:5, 563:15-17). He did not remember what happened when questioned by police in 1981 or 1982. (*Id.* at 580:25-581:13). Smitty acknowledged that the bulk of what he described in his testimony came back to him after he was questioned by Trooper Robert Gano in May 1995. (*Id.* at 560:7-10, 594:15-18). Gano poked Smitty in the chest, yelled at him, threatened to "kick [his] ass," and told Smitty that other witnesses had said he was at the Pines and that Smitty himself could be accused of the murder if he did not reveal what he knew. (*Id.* at 560:16-25, 568:8-18, 571:16-572:1). Smitty told a state trooper after the preliminary hearing that he really could not remember the events he testified about and did not think he should testify further because he could not testify truthfully. (*Id.* at 572:17-23).

Starling, Trish, and Cerenna offered more limited testimony. Each recalled that Petitioner was in the group at the Pines but they did not describe Smith being assaulted.

Starling testified that she rode in a car from the Herman party to the Melrose Tavern and then to the Pines with Cerenna, Smitty, and Trivitt. (*Id.* at 348:25-349:9, 21-23, 351:10-12, 352:11-14). They were accompanied by a second car, occupied by Petitioner, Charles Small, Frey, Tucker, Smith and Trish. (*Id.* at 349:25-350:5). Starling left the Pines

with Cerenna and Trivitt because she became concerned for her safety after Tucker propositioned her and she heard the male occupants of the second car use the word "pussy" more than once.  (*Id.* at 354:19-356:18).

Trish testified she left the Herman party in a car with Petitioner, Charles Small, Frey, Tucker and Smith and drove to the Melrose Tavern and then to the Pines.  (*Id.* at 251:19-25, 252:14-16, 254:2-10).  Petitioner made sexual advances toward her at the party, at the Melrose Tavern, and at the Pines while they were sitting in the car.  (*Id.* at 258:14-259:9). Trish was drunk and vomited in the back seat and then passed out and remembered nothing more until waking up in her bed at home.  (*Id.* at 255:3-256:6).

Cerenna testified that she drove first to the Melrose Tavern and then the Pines with Smitty, Starling and Trivitt.  (*Id.* at 462:2-14, 469:24-470:7, 13-15).  They were accompanied by a second car occupied by Petitioner, Charles Small, Smith, and Trish.  (*Id.* at 462:23-463:14, 471:2-14).  Cerenna could not remember who was driving the second car but acknowledged telling police that it was someone she knew as the Governor, who she did recall being at the Pines.  (*Id.* at 463:15-464:21, 468:24-469:3, 471:19-23).  Cerenna remained only briefly at the Pines before leaving in her car with Starling and Trivitt.  (*Id.* at 472:6-13).

Cerenna also testified that she went to Smith's house the next day because the two had plans, but Smith was not there, and, later that day, she saw Petitioner and Charles Small and asked if they had seen Smith.  (*Id.* at 473:5-13, 20-21, 474:5).  Petitioner first said

10

that Smith had run away. (*Id.* at 474:6-14). After Cerenna accused him of lying, he said

something like "She gave in, she gave up," although Cerenna could not recall the exact

words. (*Id.* at 474:15-23). Petitioner and Charles Small looked different than the night

before because they had cut their hair and shaved their facial hair. (*Id.* at 475:3-476:4).

On cross-examination, Cerenna testified that this encounter could have occurred as

long as two weeks later and that she said that Petitioner and Charles Small had changed

their appearance only after Trooper Gano brought this up. (*Id.* at 486:13-21. 498:16-500:9).

Cerenna also testified that there was a third car at the Pines, that Larry Tucker's brother,

Mike Tucker, was also there, and that she thought the person she identified as Charles

Small may have been his brother, "Petey" Small, because the two could have passed for

twin brothers at the time. (*Id.* at 477:23-478:2, 482:7-21, 484:1-3, 502:16-17, 511:4-16).

The Commonwealth also relied on the testimony of four other witnesses – Harry

Carper, Janice Small, Linda Rhinehart, and Edward Moore – who described hearing

Petitioner make incriminating statements.

Harry Carper testified that Petitioner told him sometime in 1981 that he might have

killed a girl named Cheryl Smith by hitting her over the top of the head. (*Id.* at 750:9-751:1,

11-15). On cross-examination, Carper testified that he did not recall the name Petitioner

mentioned in the conversation until after police said the name Cheryl Smith. (*Id.* at

754:11-755:5). The conversation with Petitioner occurred after Carper had two or more

beers, smoked two joints and a couple of bowls of marijuana, and consumed some pot

brownies.  (*Id.* at 756:2-14, 19-25, 757:1, 18-21, 758:16-17).  Carper testified that he had

memory problems, including difficulty remembering conversations, as the result of a bike

accident around 1985 that put him in a coma for two days.  (*Id.* at 761:8-13, 762:11-18,

763:24-764:23, 768:10-13).

      Janice Small, Petitioner's ex-wife, described three occasions on which Petitioner

made statements in August or September 1981.  The first occasion began on a night in

August 1981, when Janice Small was at her home with Kathy Small, Charles Small's wife.

(*Id.* at 774:8-15, 776:2-6).  Petitioner and Charles Small came into the house in a panicked

state, went into the bathroom, removed their clothes, washed up, shaved their beards and

mustaches, and cut their hair.  (*Id.* at 774:18-24).  Petitioner had blood smeared on his

hands.  (*Id.* at 778:2-8).  When either Janice or Kathy Small asked what happened, "John

had said that they thought they killed someone."  (*Id.* at 776:2-4).  The group then drove to

Charles Small's house, where Janice Small went to bed.  (*Id.* at 778:17-25, 780:4-6).  When

Janice Small got up the next morning, Petitioner and Charles and Kathy Small were outside,

where they were "cleaning out the car and burning the clothes, and they were talking about

another burglary."  (*Id.* at 780:20-781:1, 782:5-7).  When asked the question, "Any other

discussion about killing someone?", Janice Small testified, "While we were at Charlie's

house, the subject was brought up, and they had – and John had said that they thought they

killed someone, left her – dumped her in the woods."  (*Id.* at 782:8-13).

The second occasion was a couple days later, while Petitioner and Carper were making pot brownies. (*Id.* at 783:15-21). From the next room, Janice Small overheard Petitioner tell Carper that "I killed a girl" and that "they hit her over the head, dumped her ass in the woods and left her there." (*Id.* at 782:22-783:21).

The third occasion was while Janice Small was reading a newspaper and Petitioner walked by and said, "That's the girl we killed." (*Id.* at 784:25-785:2). Janice Small estimated that this occurred a couple weeks after the occasion when Petitioner and Charles Small ran into the house and cut their hair and shaved their beards. (*Id.* at 790:1-6, 793:10-17). The newspaper article Janice Small was reading related either to Smith being missing or her body being found. (*Id.* at 788:23-789:10, 798:12-25).

Later in the trial, as part of Charles Small's alibi defense, Charles and Kathy Small testified that events similar to those described by Janice Small occurred on August 28, 1981, after Petitioner and Charles Small entered the home of a woman named Hanna Sussman and hit her on the head. (*Id.* at 996:9-998:24, 1025:3-1026:5). After Charles Small presented his defense, he moved for a judgment of acquittal, which was joined by the Commonwealth. (*Id.* at 1038:1-3, 1051:10-15, 1055:7-1056:2). The trial court granted the motion and told the jury what had occurred. (*Id.* at 1056:3-11, 1057:14-1058:15). In closing argument, the prosecutor addressed this development in the evidence by stating, "We now know that Charlie and Johnny did come into the apartment after the Sussman burglary on

the 28th of August and they did confirm talking about hitting someone on the head, perhaps

killing them." (*Id.* at 1448:2-6).

Linda Rhinehart testified about a conversation she overheard between mid-August

and mid-September, 1981, when she was aged 14. (*Id.* at 828:21-23, 832:14-18).

Rhinehart gave the following account of what she heard in a local arcade:

> I was standing at the counter of What's a Harvey's Place waiting for a
> couple slices of pizza to be done, and as I stood there I heard a conversation
> where a male voice asked, What the hell happened last week?  The second
> voice I know to be John Small said, All hell broke loose so we got the hell out
> of there.  The first male voice said, No, I'm not talking about that, I'm talking
> about after that.  And John proceeded to say that, Oh, we drove around and
> partied for awhile, she had to pee, so we pulled over to let her go in the woods.
> He then said, I followed her into the woods 'cause I was going to get some of
> that, and he came back and told his buddies, let's share this.  The first male
> voice said, No, come on, she's not even sharing that with her boyfriend right
> now.  John  sort of chuckled.

> And that's when I got my pizza to turn around and saw that it was John
> talking, and  he made the statement,  She won't be a tease anymore.  It's
> amazing what a tire iron can do to hush someone making that much noise.

(*Id.* at 831:12-832:7).  Rhinehart was unable to identify Petitioner at trial because she was

blind as a result of a car accident in June 1985.  (*Id.* at 834:7-14).

On cross-examination, Rhinehart testified that the only other person within earshot

was an older gentleman with graying hair who regularly worked behind the counter and

remained there while she waited for her pizza. (*Id.* at 841:10-842:4).  The defense called

Larry Bowers, the arcade owner, who testified that he usually worked at the counter, that he

did not recall overhearing a conversation about an incident in which a girl was assaulted

and raped, and that he would have reported any such conversation to the police. (*Id.* at 1127:14-19, 1128:3-24).

Edward Moore testified about a conversation with Petitioner in the York County Prison in December 1995. (*Id.* at 850:24-851:7). After learning that Moore knew Tucker, Petitioner said that the State would not have a case without Tucker testifying and offered to give Moore $10,000 "to fuck him up." (*Id.* at 851:14-25). Moore responded that he did not want to get involved. (*Id.* at 852:6-7). Moore told another inmate about the encounter, who reported it to the police. (*Id.* at 861:15-17, 868:17-24). Police then visited Moore on February 26, 1996, but he refused to talk to them about his conversation with Petitioner. (*Id.* at 853:18-24). Moore then made a call to consult with his York County attorney. (*Id.* at 854:10-23). Soon after that call, Petitioner approached Moore and asked why he was talking to the District Attorney's office. (*Id.* at 854:24-855:3). Moore then had his fiancé contact the police, who returned the next morning with a District Attorney's office representative, at which point Moore told them about his conversations with Petitioner. (*Id.* at 855:25-856:4, 864:2-4). As a result, Moore reached a plea agreement that provided for a sentence on a pending charge that would be completed before the expiration of a longer sentence he was already serving. (*Id.* at 856:14-857:11, 864:14-18).

The jury returned a guilty verdict on the charges of first-degree murder and attempted rape. *Small-I*, 741 A.2d at 670. At the penalty phase, Petitioner instructed his counsel not to present mitigation. *Id.* at 670 n.4. The jury found two aggravating

circumstances: (1) Petitioner committed the killing during the perpetration of a felony, 42 PA.

CONST. STAT. § 9711(d)(6); and (2) Petitioner had a significant history of felony convictions

involving the use or threat of violence, *id.* § 9711(d)(9). *Small-I*, 741 A.2d at 670 n.4. The

jury found two mitigating circumstances under the statutory "catchall" mitigating factor, 42

PA. CONST. STAT. § 9711(e)(8): (1) Petitioner had no identified convictions since 1982; and

(2) Petitioner voluntarily identified burglary locations in the presence of police officers.

*Small-I*, 741 A.2d at 670 n.4. The jury found that the aggravating circumstances

outweighed the mitigating circumstances and returned a sentence of death. *Id.* at 670.

## III.    LEGAL STANDARDS

The statutory authority of federal courts to issue habeas corpus relief for persons in

state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may entertain an

application for a writ of habeas corpus filed by a person in state custody "only on the ground

that he is in custody in violation of the Constitution or laws or treaties of the United States."

28 U.S.C. § 2254(a).

### A.    Exhaustion and Procedural Default

Before a federal court can consider the merits of a habeas claim, the petitioner must

exhaust his remedies in state court. 28 U.S.C. § 2254(b)(1). To do so, the petitioner "must

give the state courts one full opportunity to resolve any constitutional issues by invoking one

complete round of the State's established appellate review process." *O'Sullivan v.*

*Boerckel*, 526 U.S. 838, 845 (1999). The federal claim must be "fairly presented," meaning that its "factual and legal substance" is presented in a manner that puts the state courts "on notice that a federal claim is being asserted." *Bronshtein v. Horn*, 404 F.3d 700, 725 (3d Cir. 2005) (citations omitted). A claim that has not been presented in state court is considered exhausted if state procedural rules would bar further attempts to exhaust the claim. *Shinn v. Ramirez*, 596 U.S. 366, 378 (2022). In that case, the claim is procedurally defaulted, and federal habeas review "is barred unless the prisoner can demonstrate cause for the default and prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Under 28 U.S.C. § 2254(b)(2), a federal court may choose to deny relief on the merits even if a claim is unexhausted or procedurally defaulted. *See Bronshtein*, 404 F.3d at 728.

### B.    Merits Standard

AEDPA provides that, if a claim has been adjudicated on the merits by a state court, a federal court may not grant habeas relief unless:

> the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), "clearly established Federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state-court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413. A state-court decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Section 2254(d)(1) authorizes federal habeas relief "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Under § 2254(d)(2), a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A factual determination is not "unreasonable" under

§ 2254(d)(2) "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

If the state court did not reach the merits of a federal claim, AEDPA deference does not apply, and the claim is reviewed *de novo*. *Cone v. Bell*, 556 U.S. 449, 472 (2009). A federal court may also engage in de novo review to deny habeas relief when it is unclear whether AEDPA deference applies. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

Whether review is de novo or subject to AEDPA deference, any factual determination made by the state court is presumed to be correct unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Miller-El*, 537 U.S. at 341 (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions); *Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012) (stating that § 2254(e)(1)'s presumption of correctness applies when state court did not reach merits of federal claim).

Federal habeas relief may not be granted unless a federal constitutional error resulted in "actual prejudice," which requires the petitioner to show that the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 756 (1946)). If AEDPA applies, a petitioner asserting trial error must establish both error under AEDPA and actual prejudice under *Brecht*. *See Lacombe v. Warden James T. Vaughn Corr. Ctr.*, 95 F.4th 127, 135 (3d Cir. 2024) (citing *Brown v. Davenport*, 596 U.S.

118, 122, 127 (2022)).  Because failure to establish either one will preclude habeas relief, a determination that the petitioner has not shown actual prejudice under *Brecht*, "obviates the need for . . . a separate AEDPA inquiry [and] relief must be denied."  *Id.* (quoting *Brown*, 596 U.S. at 140).

**C.     Ineffective Assistance of Counsel Standard**

To establish a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must show that counsel's performance was deficient and caused prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Deficient performance requires a showing "that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  The reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  In assessing prejudice, the reviewing court "must consider the totality of the evidence before the judge or jury."  *Id.* at 695.  A court need not address both deficient performance and prejudice if the petitioner makes an insufficient showing on either component.  *Id.* at 697.  "If it is easier to dispose of

an ineffectiveness claim on the ground of lack of sufficient prejudice, which [it is expected] will often be so, that course should be followed."  *Id.*

## D.     Evidentiary Hearing Standard

AEDPA imposes a "stringent" standard when a petitioner seeks to expand the state-court record.  *Shinn*, 596 U.S. at 371.  Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that — (A) the claim relies on — (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  "In all but these extraordinary cases, AEDPA 'bars evidentiary hearings in federal habeas proceedings initiated by state prisoners.'"  *Shinn*, 596 U.S. at 371 (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013)).

Even if not barred by § 2254(e)(2), a habeas petitioner has no automatic right to an evidentiary hearing.  *See Fooks v. Superintendent Smithfield SCI*, 96 F.4th 595, 598 (3d Cir. 2024).  A federal court must consider whether such a hearing could enable the petitioner to prove the petition's factual allegations, which, if true, would entitle him to federal habeas relief.  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  "[I]f the record refutes [the petitioner's] factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id.*

## IV.    DISCUSSION

Many of Petitioner's claims are multifaceted and allege both ineffective assistance of counsel and underlying substantive constitutional violations.  For ease of discussion, the claims will be grouped into the following categories: (1) claims based solely on ineffective assistance of counsel in the guilt phase of the trial (Claims I, II, III, VII); (2) claims related to the acquittal of Charles Small and admission of evidence that Petitioner assaulted Hanna Sussman (Claims IV.B, IV.C, X, XVIII); (3) other prosecutorial misconduct claims and related ineffective assistance of counsel claims (Claims IV.A, IV.D, IV.E, VI); (4) trial court error in the guilt phase of the trial and related ineffective assistance of counsel claims (Claims V, VIII, IX, XIII); (5) Petitioner's waiver of mitigation and other penalty phase claims (Claims XIV, XV, XVI, XVII); (6) ineffective assistance of counsel during jury selection (Claim XI); and (7) cumulative error (Claim XIX).[2]  The Court will first address exhaustion and procedural default and will then turn to the merits of the claims.

### A.    Review Is Not Barred by Failure to Exhaust or Procedural Default

The Commonwealth asserts that Claims IV.C, IV.D, IV.E, VII.C, VII.D, and XI.A are procedurally defaulted, arguing that the Pennsylvania Supreme Court's denial of relief for lack of adequate support indicates that the claims were not fairly presented or were waived. (Doc. 50 at 24-25, 32-34, 54-55).  The Commonwealth also asserts procedural default with

---

[2]    The petition also includes Claim XII, which alleges that Petitioner was denied his right to confront his accusers because the trial court admitted damaging hearsay testimony by a key Commonwealth witness.  (Doc. 1 ¶¶ 319-25).  It is unnecessary to address this claim because Petitioner withdrew it in his memorandum of law in support of the petition.  (*See* Doc. 36 at 132).

respect to Claims IV.A and XVIII insofar as factual allegations made in the supplement to

the petition in support of those claims were not presented to the state courts.  (Doc. 118 at

9-11).  In addition, the Court has identified aspects of Claims VII.A, VIII, IX, and XVII that

appear to be unexhausted because Petitioner did not present them to the state courts.  (*See*

Doc. 1 ¶¶ 224-26, 256, 259-60; Doc. 36 at 192).

    The Court concludes that neither nonexhaustion nor procedural default bars review

of these claims.  As will be addressed more specifically in the merits discussion, the Court

has concluded that each claim at issue was fairly presented and addressed on the merits in

state court or lacks merit on de novo review, thus eliminating the need to address

nonexhaustion or procedural default.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ

of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant

to exhaust the remedies available in the courts of the State."); *Marcy v. Superintendent*

*Phoenix SCI*, 110 F.4th 210, 213 n.8 (3d Cir. 2024) (denying claim on merits without

addressing procedural default).

    One other issue is potentially relevant to procedural default.  In Petitioner's first

PCRA appeal, the Pennsylvania Supreme Court confined its review to claims of ineffective

assistance of direct appeal counsel on the ground that any claims of trial counsel

ineffectiveness were waived because they were not raised on direct appeal.  *Small-II*, 980

A.2d at 559.  The court relied on a state law rule, in effect at the time of Petitioner's direct

appeal, which provided that trial counsel ineffectiveness claims "were waived if not raised by new counsel during post-trial or direct appellate proceedings." *Id.*

Petitioner argues that the factual premise for this ruling is incorrect because he was represented on direct appeal by O'Brien, who was also trial counsel and therefore could not raise any claims of trial counsel ineffectiveness. (Doc. 36 at 12); *see Small-I*, 741 A.2d at 670. Petitioner also argues that any failure to raise his federal constitutional claims on direct appeal is not adequate to bar federal review because the "relaxed waiver" rule in Pennsylvania capital cases was in effect at the time of his direct appeal. (Doc. 36 at 12-13); *see Albrecht v. Horn*, 485 F.3d 103, 115-16 (3d Cir. 2007) (holding that procedural default did not bar federal habeas review of claim not raised on direct appeal during period Pennsylvania Supreme Court was applying relaxed waiver rule).

The Commonwealth does not contest these points and or assert procedural default except with respect to the discrete claims identified above. Instead, the Commonwealth's response to the petition affirmatively states that the remainder of Petitioner's claims are not procedurally defaulted. (*See* Doc. 50 at 13, 16, 18-19, 21, 23, 26, 28, 30, 39, 41, 43, 45, 47, 50, 56, 58-60, 62, 63, 65, 67, 73). On this basis, the Court finds that the Commonwealth has waived any procedural default defense it might have asserted based on Petitioner's failure to raise his claims on direct appeal. *See Orie v. Sec'y Pa. Dep't of Corr.*, 940 F.3d 845, 854 (3d Cir. 2019) (addressing claims on merits where Commonwealth explicitly waived nonexhaustion and procedural default).

With respect to the standard of review, the fact that the Pennsylvania Supreme Court formally confined its review to claims of ineffective assistance of direct appeal counsel does not mean that AEDPA deference applies only to the state court's disposition of those claims. As addressed more specifically in the merits discussion, the state court at times denied relief because it found that the underlying claims of constitutional error or trial counsel ineffectiveness lacked merit.  In those instances, AEDPA deference applies to any components of the underlying claims that the state court adjudicated on the merits as the basis for rejecting the ineffective assistance of direct appeal counsel claim.  *See Albrecht*, 485 F.3d at 116 (applying AEDPA deference where state court did not address underlying constitutional claim "on the merits in the ordinary sense" but did examine merits in context of prejudice prong of ineffective assistance of counsel claim).

The Court will now turn to the merits of Petitioner's claims.

**B.**    **Guilt Phase Ineffective Assistance of Counsel Claims (Claims I, II, III, VII)**

**1.    Claim I.A – Failure to call witnesses to testify to Larry Tucker's incriminating statements**

Claim I.A alleges that Petitioner's trial counsel were ineffective because they failed to call two witnesses – Robert Elzey and Darick Sofi – who would have testified that Tucker told them he killed a woman and would get away with it because the police were stupid. (Doc. 1 ¶¶ 105-22).

25

### a.    Relevant background

In a statement recorded on May 17, 1995, a year before Petitioner's trial, Elzey recounted that he and Tucker were friends and coworkers who shared an interest in partying. (Doc. 26-2 at 16-17). On several occasions, Tucker bragged that he had gotten away with a homicide because the police were "pretty stupid" and "couldn't figure it out." (*Id.* at 17). Tucker said "we killed a girl" while telling Elzey that his brother, who shared an interest in the girl with Tucker, "couldn't handle what had happened and committed suicide." (*Id.*). On one occasion, when Elzey and a guy named "Derrick" were riding in Tucker's van in a remote wooded area in the Littlestown area, Tucker said that the area was "real familiar with me cause I iced a girl here." (*Id.* at 21, 26).

In a statement recorded on September 27, 1995, Sofi recounted that he was riding in Tucker's van one night with Elzey when Tucker stopped because Sofi and Elzey were fighting and said "I iced this chick." (Doc. 26-1 at 63-64). Sofi understood the statement to mean, "I killed this girl." (*Id.* at 69). Sofi thought that Tucker might have been saying it happened at the location where they were stopped, which was somewhere between York and Littlestown. (*Id.* at 63, 68).

At trial, Frey's counsel unsuccessfully attempted to cross-examine Tucker with these statements. (NT Trial at 690:4-691:3). Tucker admitted that he knew Sofi and Elzey, but he denied saying that he killed a girl or would get away with it because the police were stupid. (*Id.*). Sofi and Elzey were not called as witnesses, and no further evidence was offered on

this subject. In closing argument, the prosecutor capitalized on the failure of the defense to

produce the witnesses:

> You were asked whether you knew people in your jury selection, and two
> names were thrown at you constantly was a [Darick] Sofi and El[z]ey,[3] two
> names. And I want you to remember particularly the cross examination of
> Tucker when he was asked directly, didn't you confess to this killing to [Darick]
> Sofi? His answer was no. Didn't you confess to this killing to El[z]ey – you'll
> remember the name, El[z]ey? Didn't you confess to El[z]ey? No.
>
> Did we hear from El[z]ey? Did we hear from Sofi? Of course not. But
> the implication you are being asked to make is because the question was
> asked, that he did. Because the question was asked, that he did. There is no
> evidence in this record to support the implication in the question that he
> confessed to the killing himself to Sofi or El[z]ey. But even if he did and you
> believe [Petitioner] and Frey participated in the killing, participated in the
> attempted rape, then at the very least they're guilty of second degree murder.
> But that's not the record and don't get distracted by that.

(*Id.* at 1429:12-1430:8).

The trial court addressed this aspect of the prosecutor's argument in its jury

instructions:

> Remember, the defendants do not have the burden of proving anything.
>
> And in this connection, you will remember one of the arguments that
> [the prosecutor] made was that certain witnesses, someone [sic] Sofi and
> Robert El[z]ey, were not called as witnesses. The defendants, neither of the
> defendants have any duty or responsibility to call any witness. They don't have
> to produce any testimony, and so you cannot infer anything from their failure to
> call Sofi or El[z]ey, or any other witness, and that's because they do not have
> to prove anything.

---

[3]    The trial transcript spells these witnesses' names as "Derrick" and "Eltzey". The Court uses the
spellings "Darick" and "Elzey" because that is consistent with the state court decisions and is how the
witnesses spelled their names when questioned by police. (*See* Doc. 26-1 at 68; Doc. 26-2 at 16).

(*Id.* at 1497:17-1498:13).  Following this instruction, Evanick objected, stating that "we

specifically asked you to tell the jury that we had nothing to do with Sofi and El[z]ey."  (*Id.* at

1504:22-24).  The trial court indicated that it had forgotten this request and explained that

the instruction was intended to address the possible "fundamental error" in the prosecutor's

suggestion that failure to call Sofi and Elzey "should be inferred against the defendants."

(*Id.* at 1504:25, 1508:23-1509:7).  Evanick responded, "That's why I want to be backed out

of the issue, because we had nothing to do with those people."  (*Id.* at 1509:8-10).  The trial

court then gave an additional instruction:

> Now, I spoke to you about not calling witnesses Sofi and El[z]ey.  That
> had nothing to do with John Small's case, as I understand, that arose in the
> part of the case of the Defendant James Frey.  So that John Small had
> absolutely nothing to do with that as part of the case.  Any testimony regarding
> that related to Mr. James Frey's case.

(*Id.* at 1510:21-1511:2).

On May 16, 2001, five years after the trial, Judge Cassimatis, then acting as the

PCRA court, granted Frey a new trial based in part on his counsel's ineffectiveness for

failing to call Sofi and Elzey as witnesses.[4]  (Doc. 80-1 at 2; Doc. 26-6 at 4-32).  In his

amended PCRA petition, filed on October 1, 2001, Petitioner relied on this decision to claim

that his trial counsel were similarly ineffective for failing to call Sofi and Elzey.  (PCRA

---

[4]    The Pennsylvania Superior Court later affirmed that decision. *Commonwealth v. Frey*, No. 874
MDS 2001, 799 A.2d 168 (Mar. 13, 2002) (unpublished) (Doc. 26-6 at 34-45).  Frey then pled guilty to
third-degree murder.  (Doc. 50 at 9).

Amend. Pet. ¶¶ 84-92). Judge Cassimatis initially presided over Petitioner's PCRA

proceeding, but he recused himself and the rest of York County Court of Common Pleas

bench on April 16, 2002, after reviewing Petitioner's PCRA petition and noting that it

included allegations of prosecutorial misconduct by the trial prosecutor, who had become a

judge of that court. (Doc. 80-1 at 2). On May 31, 2002, the Honorable Edward G. Biester

was appointed to replace Judge Cassimatis as the PCRA court. (*Id.*).

In an evidentiary hearing held in July 2004, the PCRA court heard testimony from

Evanick, O'Brien, Sofi, and the defense investigator, Roger Marciano.

Evanick and O'Brien both testified that they did not recall making a strategic decision

not to call Sofi and Elzey. (NT 7/20-23/04[5] at 98:24-99:3, 368:22-24, 401:20-22, 403:1-3).

O'Brien testified that a strategic objective at trial was to show that Tucker was guilty of

Smith's murder and he considered Sofi and Elzey to be important witnesses. (*Id.* at

98:7-19, 256:21-23). O'Brien recalled that Frey's counsel was taking the lead on getting

Sofi and Elzey to court to testify. (*Id.* at 92:7-12, 21-22, 100:3-7). On May 10, 1996, five

days before the trial began, Frey's counsel indicated that he had not found Sofi and Elzey.

(*Id.* at 92:15-19, 97:25-98:2). On May 15, 1996, the first day of trial, Evanick told O'Brien to

tell Marciano to find and interview Sofi and Elzey. (*Id.* at 98:2-4). On May 16, 1996,

subpoenas bearing the signatures of Evanick and O'Brien were issued to obtain their

---

[5]     The transcript of this and other PCRA hearings are contained in continuously paginated
volumes that include multiple days. Those transcripts will be cited using the date range specified on the
cover page of the transcript.

appearance in court. (*Id.* at 247:19-248:4). O'Brien was not sure what happened after that. (*Id.* at 248:10-13). Marciano testified that on May 17, 1996 he slipped Sofi's subpoena under the door of a residence at 43 Green House Gardens in Gardners and left a message on his answering machine to call Marciano. (*Id.* at 456:10-14). Marciano was unable to locate Elzey. (*Id.* at 453:20-22).

Sofi testified that he was living at 43 Greenhouse Road in Gardners when he talked to the police on October 27, 1995, and was still living there in May 1996. (NT 7/26-28/04 at 14:17-20, 15:8-15). Sofi was willing and available to testify in May 1996 but did not recall receiving any subpoenas or messages. (*Id.* at 15:16-18, 17:1-10). When the PCRA court asked how someone who knew where he lived would contact him at that time, Sofi stated, "I don't see why if they pursued it that they couldn't have got ahold of me." (*Id.* at 19:22-20:6). With respect to Tucker's statement, Sofi testified that he was riding with Tucker and Elzey and told Tucker to pull the van over because he and Elzey were having an altercation. (*Id.* at 14:1-4). Tucker then said "this is where I iced this chick," which Sofi understood to mean that he killed a woman. (*Id.* at 14:5-10)

Although Elzey did not testify at Petitioner's PCRA hearing, the PCRA court considered the record of his testimony at Frey's PCRA hearing. (Doc. 80-1 at 11-12). In that testimony Elzey recounted that Tucker said, "You know, I can't be hanging around this area. This is the place right where I iced a girl." (Doc. 26-6 at 74). Elzey thought they were somewhere in the Littlestown area, but was not exactly sure where because he was not

familiar with the area. (*Id.* at 75). Elzey testified that he was not subpoenaed to testify at

the trial in 1996 and that he had not spoken to anyone other than the police about Tucker's

statement until he was contacted for Frey's PCRA hearing. (*Id.* at 78, 80-81).

The PCRA court also considered Sofi's testimony at Frey's PCRA hearing. (Doc.

80-1 at 11-13). That testimony was consistent with Sofi's testimony at Petitioner's PCRA

hearing, except for Sofi's recollection that he was mailed a subpoena in 1995 and called the

attorney but was told that he did not need to appear. (Doc. 26-6 at 85).

The PCRA court concluded that Evanick and O'Brien were ineffective for failing to

call Sofi and Elzey as witnesses because the minimal efforts to locate them were

unreasonable given Tucker's importance as a witness, and their testimony would have

bolstered the defense theory that Tucker had committed the crimes and placed additional

doubt on Tucker's credibility. (Doc. 80-1 at 18-19). The PCRA court further found that this

failure "could have affected the outcome of the trial," and, in combination with

ineffectiveness relating to Janice Small's testimony and a conflict of interest relating to trial

witness Patrick Berlan, "raises a reasonable probability that the outcome of [Petitioner's]

trial would have been different if not for these errors and omissions of counsel." (*Id.* at 33).

The Commonwealth appealed the PCRA court's decision. The Pennsylvania

Supreme Court reversed, holding that Petitioner had not shown prejudice:

> Even assuming the jury believed Tucker's statement to be a confession,
> and assuming Sofi's and Elzey's testimony would have effectively and fully
> impeached Tucker's testimony, such impeachment would not have changed
> the verdict. On direct appeal, this Court concluded "the eyewitness accounts,

31

[Petitioner's] numerous statements admitting to the killing and forensic evidence amply established [Petitioner's] conviction for attempted rape and first degree murder." *Small*, [741 A.2d] at 672. We did not find this in mere reliance on Tucker's testimony—"numerous statements admitting to the killing and forensic evidence" are not references to Tucker at all.

In any event, the Commonwealth's theory was never that [Petitioner] acted alone, but that he acted in concert with others. If the jury believed Sofi and Elzey, and intuited that Tucker's statement meant "I killed Cheryl Smith right here in 1981," the statement would discredit Tucker, but it would not undermine the Commonwealth's theory of the case, nor would it discredit the other evidence previously mentioned. Tucker's credibility had been assaulted to the nth degree already—the jury was shown he was a crook, a recidivist, a drug abuser, a drunkard, and an admitted liar. Given this, Sofi and Elzey were not really "crucial witnesses" who would have made an "immeasurable" difference when piled on top of the mountain of disparagement already there. Even if it were meant as a complete confession to this specific crime, this would not exculpate [Petitioner], because none of Sofi's or Elzey's testimony could contradict any of the other evidence against [Petitioner].

Therefore, the verdict probably would not have been different. The burden [Petitioner] carries is not just to prove the jury was likely to reevaluate Tucker if it heard from Sofi and Elzey; he must also prove this would in turn have caused a different verdict. In the face of significant other evidence, including the forensics and the four other witnesses to whom [Petitioner] made directly incriminating statements, *see Small*, [741 A.2d] at 671-72, this cumulative rebuttal would not have resulted in a different verdict.

One may always second-guess strategy after a trial is over; indeed, this is done in every murder case brought to this Court. But, however hindsightedly clean the trial might now appear had Sofi and Elzey been called, the legal standard is not cleanliness, much less perfection. Ultimately, we conclude [Petitioner] did not meet his burden of showing any likelihood the verdict would have been different, and thus he has not established prejudice under our jurisprudence. Therefore, direct appeal counsel was not ineffective for not raising this issue on direct appeal.

*Small-II*, 980 A.2d at 560-61.  In a footnote, in response to views expressed in concurring and dissenting opinions, the court stated that it was unnecessary to consider the credibility of Sofi or Elzey because the claim failed regardless of their credibility.[6]  *Id.* at 561 n.4.

### b.    Analysis

Because the Pennsylvania Supreme Court adjudicated the *Strickland* prejudice prong on the merits, that aspect of its decision is entitled to AEDPA deference.  For the reasons discussed below, the Court concludes that the Pennsylvania Supreme Court's decision is not "contrary to" or "an unreasonable application" of *Strickland*, *see* 28 U.S.C. § 2254(d)(1), and that Petitioner has failed to establish *Strickland* prejudice even applying de novo review.  Because the claim fails for lack of prejudice, it is unnecessary to address deficient performance.  *See Strickland*, 466 U.S. at 697.

Petitioner contends that the Pennsylvania Supreme Court unreasonably applied *Strickland* because it employed an outcome-determinative test that imposed a higher burden than the "reasonable probability" of a different outcome required by *Strickland*.

---

[6]    In a concurring opinion, Justice Saylor disagreed with the majority's view of the significance of the testimony of Sofi and Elzey, reasoning that a conclusion by jurors that Tucker participated in the killing "may have yielded a reasonable doubt on the part of jurors concerning, at a minimum, the degree of [Petitioner's] participation in the actual killing, and thus, potentially made the difference between a verdict of first- and second- degree murder."  *Small-II*, 980 A.2d at 583 (Saylor, J., concurring).  Justice Saylor nonetheless concurred in the majority's finding of lack of sufficient prejudice, reasoning that "substantial inconsistencies in Elzey's and Sofi's statements, coupled with other credibility impairments including their motivations, would have substantially diminished any potential impact of their testimony at [Petitioner's] trial."  *Id.* at 585.  In a dissenting opinion, Justice Todd agreed that the testimony of Sofi and Elzey could have cast doubt on the extent of Petitioner's participation and argued that the case should be remanded to the PCRA court for express credibility findings.  *Id.* at 587-88 (Todd, J., dissenting).

(Doc. 36 at 28-30); *see Strickland*, 466 U.S. at 694. The Commonwealth counters that the state court's ultimate finding that Petitioner did not show "any likelihood that the verdict would have been different" is consistent with *Strickland*. (Doc. 50 at 16).

The Court recognizes that the Pennsylvania Supreme Court used language at points in its analysis that might suggest it was applying a more onerous prejudice standard that *Strickland* requires. *See Small-II*, 980 A.2d at 560 (stating that impeachment of Tucker "would not have changed the verdict"); *id.* (stating that Small's burden was to prove that the jury was likely to reevaluate Tucker and "this would in turn have caused a different verdict"). However, the Pennsylvania Supreme Court did not use this language to describe its ultimate conclusions. The court summarized its prejudice analysis by stating, "[t]herefore, the verdict *probably* would not have been different." *Small-II*, 980 A.2d at 560 (emphasis added). The court reiterated its conclusion by stating, "*[u]ltimately*, we conclude Small did not meet his burden of showing *any likelihood* the verdict would have been different, and thus he has not established prejudice under our jurisprudence." *Id.* at 560-61 (emphasis added). These statements are entirely consistent with *Strickland*'s requirement of a "reasonable probability" that "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Because the Pennsylvania Supreme Court's specific findings and conclusions are phrased in language consistent with *Strickland*, the Court concludes that "fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents."

*See Richter*, 562 U.S. at 102. Therefore, the Court concludes that the prejudice standard the Pennsylvania Supreme Court actually applied is not "contrary to" or "an unreasonable application" of *Strickland*'s "reasonable probability" standard. *See* 28 U.S.C. § 2254(d)(1).

The Court next turns to the Pennsylvania Supreme Court's adjudication of the *Strickland* prejudice prong. Under AEDPA review, the issue is whether the Pennsylvania Supreme Court's conclusion that the verdict "probably would not have been different" if Sofi and Elzey had testified, *Small-II*, 980 A.2d at 560, "involved an unreasonable application" of *Strickland* or is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. §§ 2254(d)(1), (2). For the sake of completion, the Court will also consider whether, assuming *arguendo* that the Pennsylvania Supreme Court applied an incorrect prejudice standard under *Strickland*, Petitioner would be entitled to relief on de novo review. For the reasons discussed below, the Court concludes that Petitioner is not entitled to a new trial under either approach because there is no "reasonable probability" that, if Sofi and Elzey had testified, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The Court agrees with the Pennsylvania Supreme Court's assessment that Sofi's and Elzey's testimony had minimal impeachment value in view of the Commonwealth's theory of the case and the evidence aside from Tucker's testimony, which included Petitioner's numerous incriminating statements. As the Pennsylvania Supreme Court found,

> Even assuming the jury believed Tucker's statement to be a confession, and assuming Sofi's and Elzey's testimony would have effectively and fully

impeached Tucker's testimony, such impeachment would not have changed the verdict. . . . [T]he Commonwealth's theory was never that Small acted alone, but that he acted in concert with others. If the jury believed Sofi and Elzey, and intuited that Tucker's statement meant "I killed Cheryl Smith right here in 1981," the statement would discredit Tucker, but it would not undermine the Commonwealth's theory of the case, nor would it discredit the other evidence [including numerous statements admitting to the killing]. Tucker's credibility had been assaulted to the nth degree already—the jury was shown he was a crook, a recidivist, a drug abuser, a drunkard, and an admitted liar. Given this, Sofi and Elzey were not really "crucial witnesses" who would have made an "immeasurable" difference when piled on top of the mountain of disparagement already there. Even if it were meant as a complete confession, . . . none of Sofi's or Elzey's testimony could contradict any of the other evidence against Small.

Therefore, the verdict probably would not have been different.

*Small-II*, 980 A.2d at 560.

As the Pennsylvania Supreme Court points out, the Commonwealth's theory was that Petitioner acted in concert with others. Even without the testimony of Sofi and Elzey, the jury had ample reason to consider the possibility that Tucker himself killed Smith or participated in her killing.

First, the jury knew that Tucker himself had been charged with Smith's murder, that he was testifying pursuant to a plea agreement that might result in the charges being dropped, and that he believed he had a greater chance of receiving less time if the other defendants were convicted. (NT Trial at 637:21-638:5, 673:18-21).

Second, the jury knew that Tucker had been in a relationship with Smith at the time of her death. (*Id.* at 641:6-7). The jury also heard testimony that Tucker physically abused

36

Smith, that he repeatedly threatened to kill her, and that he was jealous and possessive. *(Id.* at 290:23-291:2, 5-9, 317:7-20).

Third, the jury had reason to question Tucker's general credibility. As the Pennsylvania Supreme Court found, the jury was shown that Tucker was "a crook, a recidivist, a drug abuser, a drunkard, and an admitted liar." *Small-II*, 980 A.2d at 560.

Fourth, the jury was made aware during Tucker's cross-examination of statements by others that raised the issue that he was a more direct participant in Smith's murder than he admitted. Although Sofi and Elzey did not testify at trial, the jury was made aware of their allegations regarding Tucker's statement about killing a girl through Frey's counsel's cross-examination of Tucker:

> Q.    Do you know a Robert El[z]ey?
>
> A.    I do, indeed.
>
> Q.    Do you know a [Darick] Sofi?
>
> A.    Yes, sir.
>
> Q.    Isn't it true that you once told them that you had killed a girl?
>
> A.    No, sir.
>
> Q.    Isn't it true that you once showed one or both of them a location where you said you had killed her at?
>
> A.    No, sir.
>
> Q.    Isn't it true that you said that you would get away with that crime because the police were stupid?

A.     No, sir.

(NT Trial at 690:14-691:3).  This testimony certainly alerted the jury that allegations had been made by Sofi and Elzey which in turn could readily have impeached Tucker's credibility specifically concerning his lack of involvement in Smith's killing.

Frey's counsel also questioned Tucker about statements made by Patrick Berlan, an inmate with whom Tucker was incarcerated in 1993:

Q.     Do you know Patrick Berlan?

A.     Yes, I do.

Q.     Isn't it true that you were incarcerated with him at York County Prison in August or September of 1993?

A.     Yes, sir.

Q.     And at that time, you recounted for him the details of the . . . Cheryl Smith murder?

A.      No, sir.

Q.     Isn't it true that you did so without mention of James Frey?

A.     No, sir.

Q.     Isn't it true that just a month or so ago you came across Patrick Berlan again at the York County Prison and spoke to him once again about what you had said to him in August and September of '93?

A.     Don't think so, sir.

Q.     Isn't it true that at that meeting you told him that you were implicating Frey now so you could keep your deal with the Commonwealth and look out for number one?

A.    That's a total lie . . . .

(*Id.* at 691:4-692:1). This testimony, which immediately followed questioning about Tucker's alleged statements to Sofi and Elzey, again provided the jury with information which could have impeached Tucker's credibility specifically concerning his lack of involvement in Smith's killing.

Finally, in incriminating statements reported by testifying witnesses, which the Court sets forth below, Petitioner allegedly used the pronouns "we" and "they" when describing Smith's murder. (*See id.* at 782:11-13, 784:5-10, 785:1-2, 831:12-832:7). These references to group involvement in the murder supported the Commonwealth's theory that Petitioner acted in concert with others and did not eliminate Tucker as one of the participants.

The Court further agrees with the Pennsylvania Supreme Court's view that Sofi's and Elzey's testimony had minimal impeachment value, based in part on Petitioner's "numerous statements admitting to the killing" and recognition that "the Commonwealth's theory was never that Small acted alone." *Small-II*, 980 A.2d at 560 (quoting *Small-I*, 741 A.2d at 672). Petitioner's "numerous statements admitting to the killing" were described in the testimony of Cerenna Hughes, Harry Carper, Janice Small, and Linda Rhinehart. Each of these witnesses recounted statements in which Petitioner admitting to killing Smith, either by referring to her directly or by describing his participation in terms that corresponded to the circumstances of her murder. The Court finds that each of these individuals provided testimony that was reliable and probative of guilt.

39

Cerenna Hughes testified that Petitioner and Charles Small were among the group that remained at the Pines with Cheryl Smith after Ms. Hughes departed. (NT Trial at 472:6-18). She recounted seeing Petitioner and Charles Small after the night at the Pines and asking them if they had seen Cheryl Smith. (*Id.* at 474:5). Ms. Hughes stated that Petitioner said something like "she run away" and she responded, "you're lying." (*Id.* at 474:7-17). Ms. Hughes further testified that Petitioner replied something like "she gave in, she gave up." (*Id.* at 474:20-23). She originally identified the date of this encounter to be August 6, 1981, and noted that both Petitioner and Charles Small had cut their hair and shaved their beards since she had seen them on August 5th. (*Id.* at 475:3-476:4). On cross-examination, Ms. Hughes confirmed that this encounter could have been as much as two weeks after August 6th and, ultimately, she concluded that she could not say when the encounter occurred because "it's been so long." (*Id.* at 486:19-487:3).

Although the jury would have had reason to question the reliability of the date of the encounter initially identified by Ms. Hughes to be August 6, 1981, she reasonably pointed to the passage of time in trying to accurately remember the date. The Court finds that Ms. Hughes' inability to recall the precise date of the encounter would not have affected the probative value of her testimony as to what Petitioner said when she asked about Cheryl Smith. Petitioner's statement "she gave in, she gave up" is a first-hand account concerning Cheryl Smith at the Pines on the night in question which supports the finding that he was on

the scene at the time of the attempted rape and murder, i.e., Petitioner was with Cheryl Smith when "she gave in, she gave up."

Harry Carper also related a conversation in which Petitioner directly implicated himself in Smith's murder. (*See id.* at 750-51). Carper testified that while he was visiting Petitioner at his residence and Janice Small was in another room, Petitioner told Carper "he might have killed a girl," and the girl's name was Cheryl Smith. (*Id.* at 750:21-751:1, 16-21). In answer to the question "Can you tell the members of the jury if he told you about how she had been injured or how she had been killed," Carper answered, "To the best of my knowledge, I do believe that he said he hit her over the top of her head." (*Id.* at 751:11-15). Carper recounted that he and Petitioner were making pot brownies before this conversation occurred. (*Id.* at 757:18-21, 758:3-5, 768:6-9). Although Carper's ability to recall the conversation was challenged on cross-examination (*id.* at 754-64), the Court concludes that the jury would likely have found his testimony credible because the general conversation described by Carper was corroborated by Janice Small.

Janice Small recounted a conversation between Petitioner and Carper while the two were making pot brownies in the kitchen and Janice Small was in the next room. (*Id.* at 783:18-24, 784:19-21). Janice Small heard Petitioner say to Carper "I killed a girl. And he proceeded to tell [Carper] that he killed – that they hit her over the head, dumped her ass in the woods and left her there" and she "specifically recall[ed]" the use of the word "they," the words "hit her over the head" and the words "dumped her in the woods." (*Id.* at 784:4-16).

41

Janice Small also testified about an incident where Petitioner said "that's the girl we killed" as she was reading a newspaper article about Cheryl Smith and he was walking by. (*Id.* at 785:1-2). Janice Small's recollection of the newspaper incident during cross-examination was shown to be flawed in some respects, including comparisons with her preliminary hearing testimony and a statement she made to the police in 1991. (*Id.* at 787-99). However, the Court concludes that the jury was unlikely to have discounted Janice Small's credibility on the basis of these discrepancies given that she first revealed the information when interviewed by police almost ten years after the incident and testified about it five years later.

In addition to these accounts of statements by Petitioner that were directly connected to Cheryl Smith, Linda Rhinehart and Janice Small recounted statements in which he admitted to killing an unnamed girl in a manner that corresponded to the circumstances of Smith's murder.

Linda Rhinehart testified that, while standing at a snack counter at an arcade in Hanover in 1981 (some time from mid-August to mid-September *(id.* at 832:16-18)), she overheard a conversation in which Petitioner took part:

> . . . I heard a conversation where a male voice asked, What the hell happened last week? The second voice I know to be John Small said, All hell broke loose so we got the hell out of there. The first male voice said, No, I'm not talking about that, I'm talking about after that. And John proceeded to say that, Oh, we drove around and partied for awhile, she had to pee, so we pulled over to let her go in the woods. He then said, I followed her into the woods 'cause I was going to get some of that, and he came back and told his buddies, let's

share this.  The first male voice said, No, come on, she's not even sharing that
with her boyfriend right now.  John sort of chuckled.

> And that's when I got my pizza to turn around and saw that it was John
> talking, and he made the statement,  She won't be a tease anymore.  It's
> amazing what a tire iron can do to hush someone making that much noise.

(*Id.* at 831:14-832:7).  Rhinehart further testified that the only other person within earshot

was the man working behind the counter.  (*Id.* at 841:10-15).  This individual was Larry

Bowers who was later called to testify.  He was asked if he recalled "overhearing a

conversation among a group of individuals near the counter in which they described an

incident in which a girl was led off into the woods, assaulted, and raped."  (*Id.* at 1128:9-12).

He responded, "No, nothing like that," and, confirmed that, if he had overheard this

conversation, he would have reported It to the police.  (*Id.* at 1128:13-24).  Bowers further

testified that it was a busy and noisy place, and he did not pay much attention to the talk

going on.  (*Id.* at 1129:23-1130:2).  Finally, Bowers was asked, "Is it fair to say, sir, that the

only way you could have remembered any conversation particularly is if it related to a

subject matter such as killing or rape?"  (*Id.* at 1130:3-6).  Bowers responded, "Yeah, I'd

have remembered that, yeah."  (*Id.* at 1130:7).

The Court concludes that Bowers' testimony did not significantly undermine

Rhinehart's testimony.  While Bowers said he would have remembered a conversation he

overheard about murder or rape, he also said the place got noisy, he did not pay attention to

conversations, and he did not hear the conversation Ms. Rhinehart testified about.  Further,

while the conversation in which Petitioner participated suggested rape and assault, the subject matter was not overtly about rape or killing.

Janice Small also described statements Petitioner made in the course of events that began at her trailer one night in August 1981 and continued the next morning at the residence of Kathy and Charles Small. (*Id.* at 774-82). Janice Small testified that Petitioner and Charles Small arrived at the trailer in a panicked state and went into the bathroom, where they were washing up, cutting their hair, and shaving their beards and mustaches. (*Id.* at 774:18-24). When either Janice Small or Kathy Small asked what happened, "John had said they thought they killed someone." (*Id.* at 776:2-4). Janice Small further testified that the next morning, while the group was at Kathy and Charles Small's residence, John and Charles Small were "cleaning out the car and burning the clothes, and they were talking about another burglary." (*Id.* at 782:5-7). Janice Small recounted that, "John had said that they thought they killed someone, left her – dumped her in the woods." (*Id.* at 782:11-13).

Evidence offered to support Charles Small's alibi defense subsequently established that these events occurred on August 28, 1981, after Petitioner and Charles Small broke into Hanna Sussman's home and assaulted her. (*See id.* at 982:2-19, 996:9-998:24, 1025:3-1026:5). This evidence caused the Commonwealth to change its initial position that the events and the statements recounted by Janice Small occurred shortly after Petitioner and Charles Smith returned home following Smith's murder. (*See id.* at 67:23-68:13, 1448:2-6). Notwithstanding this development regarding the timing of the events, Petitioner's

44

statement, "that they thought they killed someone, left her – dumped her in the woods," remained probative of guilt.  Janice Small testified that Petitioner and Charles Small talked about events other than the Sussman assault during the occasion she described. Moreover, Petitioner's statement described the circumstances of Smith's murder, and the jury had no basis for inferring based on the timing of the statement that Petitioner was referring to Sussman because no evidence established that Sussman was either "killed" or "dumped . . . in the woods."

Donald Jeffries, Charles Small's parole agent in 1981, testified that his records of the details of the Sussman incident indicated that, on August 28, 1981, Petitioner and Charles Small gained entrance to Sussman's residence under false pretenses, grabbed her and forced her to the floor of her apartment, and that Petitioner struck her on the head with a billy club.  (*Id.* at 982:4-19).  Jeffries also recounted based on his records that Sussman testified at Charles Small's parole violation hearing that "she pretended she was unconscious so they would not harm her any further."  (*Id.* at 986:10-987:1). Thus, the Court concludes that Petitioner's statement, "that they thought they killed someone, left her – dumped her in the woods" provided additional probative evidence of his participation in Smith's murder.

In addition to the foregoing evidence of Petitioner's statements admitting to Smith's killing, Edward Moore described a conversation with Petitioner that reflected consciousness of guilt.  Moore testified that the conversation occurred in the York County Prison in early

December 1995. (*Id.* at 850:24-851:11). After learning that Moore knew Tucker, Petitioner said that the state would not have a case against him without Tucker testifying and offered to give Moore $10,000 "to fuck him up." (*Id.* at 851:14-25). Moore responded that he did not want to get involved. (*Id.* at 852:6-7).

The Court finds that Cerenna Hughes, Harry Carper, Janice Small, Linda Rhinehart, and Edward Moore each provided testimony which was reliable and probative of guilt. Considering the testimony of these five individuals cumulatively, the Court is persuaded that there is no reasonable probability that the outcome of the proceedings would have been different if Sofi and Elzey had testified. Further, while not making credibility findings regarding Sofi and Elzey, the Court notes that in Justice Saylor's concurring opinion, the "fuller context" of Sofi's and Elzey's statements is considered. *Small-II*, 980 A.2d at 583. Justice Saylor noted that there were many instances where their various statements were internally and externally inconsistent. *Id.* Inconsistencies in Sofi's and Elzey's statements would further reduce any probability that the verdict would have been different had they testified. In addition, the Court's conclusion takes into account the thorough and unchallenged jury instructions provided by the trial judge on the charge of first degree murder and accomplice liability. (*See* NT Trial at 1482:21-1487:3).

For the reasons set out above, the Court concludes that the Pennsylvania Supreme Court's adjudication of the *Strickland* prejudice prong did not result in a decision that is "contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Court

further concludes that the Pennsylvania Supreme Court's decision is not "based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d)(2). Moreover, even assuming *arguendo* that de novo

review applies, the Court concludes that Petitioner has not demonstrated "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different." *Strickland*, 466 U.S. at 694. The Court will deny relief on Claim I.A.

### 2.    Claim I.B – Failure to impeach Larry Tucker with *crimen falsi* convictions

Claim I.B alleges that Petitioner's trial counsel were ineffective because they failed to

impeach Tucker with his *crimen falsi* convictions for burglary, unauthorized use of an

automobile, and escape. (Doc. 1 ¶¶ 123-27). On PCRA appeal, the Pennsylvania

Supreme Court held that direct appeal counsel was not ineffective for not claiming that trial

counsel was ineffective. *Small-II*, 980 A.2d at 566. The court explained that Tucker's

credibility "was already assaulted to the nth degree—he was depicted as a crook, a

recidivist, a drug abuser, a drunkard, and an admitted liar." *Id.* at 565. The court concluded

that impeachment with the *crimen falsi* convictions "would have just reiterated a significant

credibility attack that already occurred" by counsel who "was highly effective in being able to

show the jury all the holes in Tucker's credibility." *Id.* at 565-66. This is an adjudication of

the merits of the *Strickland* prejudice prong that is entitled to AEDPA deference.

It is unnecessary to address deficient performance because the Court concludes that the state court reasonably applied *Strickland* in concluding that Petitioner did not establish prejudice. Petitioner argues that none of the other impeachment the state court pointed to is truly cumulative of a record of *crimen falsi* convictions. (Doc. 36 at 37-38). Even if this is true, the Court cannot conclude that impeachment with the *crimen falsi* convictions would have had a significant enough impact on the jury's view of Tucker's credibility to create a reasonable probability of a different outcome or that it was unreasonable for the state court to conclude otherwise.

For these reasons, the Court concludes that the Pennsylvania Supreme Court reasonably applied the relevant Supreme Court precedent and did not unreasonably determine the facts. The Court will deny relief on Claim I.B.

### 3. Claim II – Failure to object to Janice Small's testimony based on the marital privilege

Claim II alleges that Petitioner's trial counsel were ineffective because they failed to object to Janice Small's testimony that Petitioner told her, "That's the girl we killed," based on the state-law marital privilege, 42 PA. CONS. STAT. § 5914.[7] (Doc. 1 ¶¶ 128-37; NT Trial at 784:25-785:2).

---

[7]    42 PA. CONS. STAT. § 5914 provides that, "in a criminal proceeding neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other, unless this privilege is waived upon the trial."

At the PCRA hearing, Evanick testified that he could not recall whether he knew that Petitioner and Janice Small were married at the time of the statement. (NT 7/20-23/04 at 378:4-9, 382:8-15). O'Brien testified that he believed that he and Evanick knew they were married, that he made a note on a case about the marital privilege before trial, and that he did not recall any conscious decision to waive the privilege. (*Id.* at 126:13-127:3, 244:11-14). The PCRA court found that counsel were ineffective for failing to object to Janice Small's testimony based on the marital privilege. (Doc. 80-1 at 24-27). The PCRA court further found that this ineffectiveness "could have affected the outcome of the trial," and, in combination with ineffectiveness concerning Sofi and Elzey and a conflict of interest relating to trial witness Patrick Berlan, "raises a reasonable probability that the outcome of [Petitioner's] trial would have been different if not for these errors and omissions of counsel." (*Id.* at 33).

The Pennsylvania Supreme Court reversed. *Small-II*, 980 A.2d at 562. The court explained that the marital relationship between Petitioner and Janice Small at the time of the communication was not itself enough for the privilege to apply:

> For § 5914 to apply, it is also essential . . . the communication be made in confidence and with the intention that it not be divulged. We look to whether the spouse making the statement had a reasonable expectation the communications would be held confidential. Generally, the presence of third parties negates the confidential nature of the communication. Even if privileged testimony under § 5914 is erroneously admitted into evidence, it is harmless error if it is merely cumulative of other admissible testimony.

*Id.* at 562 (quotation marks and citations omitted). The court concluded that § 5914 did not apply to the statement, "That's the girl we killed," because Petitioner "made multiple similar incriminating statements to multiple persons [and thus] lacked the requisite intent to not divulge the statement for the statement to be confidential under § 5914." *Id.* The court also held that, even if the statement was privileged, Janice Small's testimony was cumulative of the evidence of other similar incriminating statements, consisting of: (1) Petitioner's statement that "they thought they killed someone" the night he and Charles Small returned to Petitioner's home, which he repeated the next day; (2) Petitioner's statement to Carper that he killed a girl; and (3) evidence that Rhinehart and Cerenna "heard [Petitioner] confess to Smith's murder." *Id.* For these reasons, the Pennsylvania Supreme Court held that the PCRA court erred in finding that trial and direct appeal counsel were ineffective. *Id.* This is an adjudication of the merits of both *Strickland* prongs that is entitled to AEDPA deference.

Petitioner argues that the Pennsylvania Supreme Court unreasonably applied *Strickland* because the evidence of incriminating statements to others does not support a finding that Petitioner waived the marital privilege with respect to the statement to Janice Small. (Doc. 36 at 42). This is a disagreement with the state court's interpretation of § 5914, which may not be reexamined by this Court. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Having concluded that the marital privilege did not apply, the state court did not unreasonably apply *Strickland* in holding that counsel were not

ineffective for failing to raise it. *See Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) (reasoning that "counsel cannot be deemed ineffective for failing to raise a meritless claim").

Petitioner also contends that the Pennsylvania Supreme Court unreasonably determined the facts in its finding that Janice Small's testimony was cumulative of other similar incriminating statements that were admitted into evidence. (Doc. 36 at 43). The Court disagrees with Petitioner's assertion that "the evidence demonstrated that any statements made by Petitioner in Charles' presence related to the Hanna Sussman assault." (Doc. 36 at 43). As previously discussed in connection with Claim I.A, Janice Small testified that Petitioner and Charles Small talked about events other than the Sussman assault during the occasion she described (NT Trial at 782:5-7), and the evidence provided no basis for inferring that Petitioner's statement "that they thought they killed someone, left her -- dumped her in the woods" (*id.* at 782:12-13), referred to the Sussman assault. The evidence of this incriminating statement and Carper's testimony that Petitioner told him that he killed a girl named Smith amply supports the state court's finding that Janice Small's testimony concerning the allegedly privileged statement was cumulative. Therefore, the Court cannot conclude that the state court's decision is based on an unreasonable determination of the facts. *See Wood,* 558 U.S. at 301-02 (finding state court's factual determination was not unreasonable where evidence in state-court record could fairly be read to support it).

For the above reasons, the Court concludes that the Pennsylvania Supreme Court reasonably applied the relevant Supreme Court precedent and did not unreasonably determine the facts. The Court will deny relief on Claim II.

### 4. Claim III – Trial counsel had a conflict of interest due to prior representation of Patrick Berlan

Claim III alleges that a conflict of interest prevented Petitioner's counsel from effectively cross-examining or eliciting exculpatory evidence from Patrick Berlan, a witness called during Frey's defense who was previously represented by the York County Public Defender Office. (Doc. 1 ¶¶ 138-48). Petitioner also alleges that trial and direct appeal counsel were ineffective for failing to properly raise and litigate this claim. (*Id.* ¶ 147).

#### a.  Relevant background

Berlan was called during Frey's defense to impeach Tucker's testimony that Frey was involved in Smith's murder. (NT Trial at 936-39). Berlan testified that Tucker talked to him about Smith's murder when the two encountered each other in the York County Prison in 1993. (*Id.* at 937:9-938:6). Tucker said that he was with "a bunch of guys partying with some girls" who left a party in Hanover, drove in two cars to get alcohol, and then went to the Pines. (*Id.* at 938:11-24). Berlan then began to fill in the details but was interrupted by an objection before he could complete his answer:

> A.    . . . The one car left and they were supposed to meet up with the next group of people later on that night. He didn't say where, he just said they were supposed to meet them later. He stated that it was five people that was with him in the car. When the first car left, that remained five people with him in his car. He stated that the one girl was sick by the

> name of Trish, that's all he gave as far as details of the girl was throwing
> up in the car and she stayed in the car, while her – himself, Lawrence
> Tucker, a girl named Cheryl, and the Small brothers –

MR. EVANICK:  Objection, Your Honor.  Can we approach?

(*Id.* at 938:25-939:13).  In a sidebar discussion, Evanick explained that he had understood

that Frey's counsel would only ask Berlan to testify that Tucker did not mention Frey's

involvement.  (*Id.* at 940:9-14).  The trial court ruled that the jury would be instructed on the

limited purpose of Berlan's testimony and told the prosecutor not to go into anything Tucker

said about Petitioner and Charles Small during cross-examination.  (*Id.* at 945:19-25,

947:4-13).  The court then gave the following instruction:

> Ladies and gentlemen of the jury, as you know, we're now in the case
> of the defense of James Frey, and what you're hearing from the witnesses that
> are being called by James Frey only apply to the James Frey case.  This is
> clear.

> Now, you've just heard testimony that affected not only James Frey, but
> also the other defendants, the two Smalls.  You are to disregard that.  And I
> know some people are cynics and say you tell the jury to disregard it, they can't
> put it out of their mind.  I think you can.  You swore to follow my instructions as
> a matter of law, and I'm instructing you that what this witness said about what
> Mr. Tucker said about the Smalls is not for you to consider in the case against
> the Smalls, because we are not in their case, we're in the James Frey case.
> And the only thing you are to consider in what Mr. Berlan said is what Mr.
> Tucker said as far as James Frey is concerned.

> That is absolutely imperative that you let his reference to – Mr. Berlan's
> reference to what Mr. Tucker said about the Smalls play absolutely no part in
> your deliberation in the case against the Smalls, because it wasn't brought up
> in this case.  That has nothing to do with this case.

> It's absolutely imperative that you follow my instruction to the letter of
> the law in that regard.  Erase it from the [sic] your mind.  Don't even let it linger

and, you know, think about it in any way when you retire to deliberate on the Smalls' case.

(*Id.* at 947:25-949:5).

Following this instruction, Berlan testified that Tucker did not say anything about Frey being involved in the incident he described. (*Id.* at 950:8-12). Berlan also recounted that he encountered Frey in prison in 1995 and "let him know, basically, that I knew Larry Tucker, that he never told me nothing about him." (*Id.* at 951:9-17). On cross-examination, the prosecutor confirmed that Tucker told Berlan there were five people in the car, without asking Berlan to name them. (*Id.* at 959:19-960:8).

Before cross-examining Berlan, Evanick informed the trial court in a sidebar that the York County Public Defender Office had represented Berlan in 1993, while Berlan was trying to inform in another Hanover homicide. (*Id.* at 961:23-962:2). In this and later discussion with the court, Evanick explained that this prior representation precluded him from impeaching Berlan by eliciting that he never told police about his conversation with Tucker, which suggested that the conversation did not occur. (*Id.* at 962-64, 1114-16). Unsuccessful efforts were made to resolve the matter through a stipulation and by inquiring whether Berlan would waive the attorney-client privilege. (*Id.* at 964-65, 969-71, 1112-17). The trial court stated at one point that it was "concerned about the ethical issue" but ultimately permitted Evanick to question Berlan. (*Id.* at 1115:18-19, 1142:6-19). Before doing so, Evanick twice went over with the court what he intended to ask:

54

MR. EVANICK:  With respect to Berlan, I just want to make sure that I am clear what the Court has restricted my questioning of Mr. Berlan to, that is that only to the facts that he was talking to the police and was informing about a homicide that occurred in the Hanover area in 1994, and that . . . at the time he was doing this, he had current charges.

. . .

MR. EVANICK:  We're calling Mr. Berlan to have him testify that in 1994, he was arrested on a series of burglary charges, and that at that time, he contacted the Hanover Police Department and volunteered that he had information about a homicide involving a Mr. Pohlman, who owned a train shop in Hanover.

THE COURT:  How do you know he volunteered?  He was in contact, but the word volunteer.

MR. EVANICK:  He was the one in contact with the Hanover police about the Pohlman homicide.  He spoke to the police on a couple occasions, and the only reason I'm doing it, he had ample opportunity to tell them about Cheryl Smith.

(*Id.* at 1142:6-11, 15-16, 1194:18-1195:7).  Evanick also informed the trial court that he had just learned from Berlan's counsel that Berlan had additional information concerning a conversation between Tucker and Edward Moore, who had earlier testified as a Commonwealth witness.  (*Id.* at 1195:8-13).  After a brief recess to allow him to consider the matter, Evanick indicated that he would question Berlan about this new information.  (*Id.* at 1196:11-25).

Evanick first elicited Berlan's testimony that he was arrested for burglary charges in 1994 and talked to police twice about the Pohlman homicide at that time.  (*Id.* at 1198:4-6, 14-25, 1199:1-3, 8-11).  Evanick then elicited Berlan's account of a conversation with Tucker and Moore in the York County Prison in March 1996.  (*Id.* at 1199-1202).  Berlan

commented to Tucker, referring to the Smith murder, "You're going to be all right, then, with

your time?" (*Id.* at 1200:23-1201:6). At that point, Moore "just laughed and giggled a little

bit, laughed and said that we got something for him to go try," and "You'll see when I go to

court." (*Id.* at 1201:8-10, 13).

Evanick and the prosecutor both addressed Berlan's testimony in closing arguments.

Evanick addressed Berlan's credibility along with that of Moore and Tucker:

> Now, we got one other admission to deal with, and that's the wonderful
> admission from Mr. Ed Moore. And I think you should look at Ed Moore and
> Patrick Berlan and Larry Tucker in the same category, people who are here
> from jail talking about things they overhear in jails.
>
> I mean, Patrick Berlan offers a really interesting piece of testimony, he
> says that when I was here in March of '96, I saw Ed Moore and Larry Tucker in
> a cell talking, being friendly, and then Moore made this little cryptic comment
> about how we got something lined up for court, chuckle, chuckle, chuckle,
> chuckle, chuckle. Do I think that occurred? I really don't know.
>
> I don't think there is any way for you to decide when dealing with a
> person who has a lie pattern, if whether or not he's telling the truth.

(*Id.* at 1393:25-1394:16). After addressing Moore's testimony, Evanick again mentioned

Berlan:

> Again, you know, I think you can remember Berlan, Ed Moore, and Larry
> Tucker, all in the same group of people who have been in jail, who don't like
> jail and desperately want to get out or who want to cut their losses. Highly
> motivated to say and do almost anything to help their case. It's unfortunate,
> but it's true.

(*Id.* at 1396:15-21). In his closing argument, the prosecutor addressed Berlan's failure to

tell police what he learned from Tucker about the Smith murder:

. . . I want to tell you what my view on Berlan is. It was testimony presented from that witness stand, Berlan was brought back for a second appearance, okay, and it was elicited from Berlan that he was talking to the police and cooperating about the Pohlman homicide. That's another unsolved homicide up in the Hanover area. He was cooperating with the police. He's providing information to the police about the Pohlman homicide.

Now, does it make sense if that is what is happening, and the implication being he's trying to get his deal for the Pohlman homicide and he doesn't mention the Frey homicide, or the Frey conversation, or the Tucker situation, doesn't that raise a question in your mind as to whether it even occurred? If he gets information about another homicide, he's already talking to police, cooperating on the one, doesn't it makes [sic] sense, ladies and gentlemen, he's going to go right to the police and talk to them and say, I got more information about another homicide? No.

Now, I guess maybe he didn't get a deal in the Pohlman homicide and he's mad at the police so he's going to come over and do this. I don't know. That's speculation. But the point I want to make if he's talking to the police and cooperating and he has information on another homicide, does it make sense he'd be talking to the police trying to better his position with them? I suggest to you it does.

(*Id.* at 1451:5-1452:19).

Petitioner raised the conflict of interest in his PCRA proceeding, claiming that he was denied his right to effective assistance of counsel due to the York County Public Defender Office's prior representation of Berlan. (PCRA Amend. Pet. ¶¶ 265-68, 272-78). The PCRA court denied the Commonwealth's motion to dismiss this claim and included it in the list of claims that could be addressed in the upcoming evidentiary hearing. (Doc. 115-5 at 148).

At the evidentiary hearing, O'Brien testified that he was aware that Berlan had been represented by the York County Public Defender Office and that Evanick alerted the trial court to the issue. (NT 7/20-23/04 at 193:10-16). O'Brien recalled interviewing Berlan in

prison in April or May, 1996, but did not recall whether Berlan was there on pending charges or was serving a sentence on a prior case. (*Id.* at 193:18-21, 194:5-6).

In its decision following the hearing, the PCRA court concluded that Petitioner was entitled to relief on this claim. (Doc. 80-1 at 33). The court first described the applicable standard, stating that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." (*Id.* at 30 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980)). The court concluded that Petitioner "made an adequate showing with respect to counsel having let his conflict of interest compromise his examination of Berlan. Therefore, counsel was ineffective in this respect." (*Id.* at 31). The court further found that "a conflict of interest resolved to the detriment of one's client need not be supported by a determination with respect to outcome. *Cuyler v. Sullivan, supra.* Such a conflict, along with its effect on counsel's representation of Petitioner constitutes ineffective assistance of counsel in and of itself." (*Id.* at 33). The court further concluded that the conflict of interest, in combination with ineffectiveness relating to Sofi and Elzey and Janice Small, "raises a reasonable probability that the outcome of [Petitioner's] trial would have been different if not for these errors and omissions of counsel." (*Id.*).

On appeal, the Pennsylvania Supreme Court reversed. *Small-II*, 980 A.2d at 564. The court first set forth the applicable standard:

> A defendant who failed to object at trial must demonstrate an actual conflict of interest adversely affected his counsel's performance. *Cuyler*, [446

Case 3:09-cv-02023-RDM-AP    Document 120    Filed 05/15/25    Page 59 of 99

U.S. at 348]. *Cuyler* held a defendant who shows counsel's conflict of interest actually affected the adequacy of his representation does not have to show prejudice. *Id.*, at 349-50. However, we have consistently stated, "'A defendant cannot prevail on a conflict of interest claim absent a showing of actual prejudice.' " *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1231 (2006). *Spotz* clarified this standard further by stating *Commonwealth v. Hawkins*, 567 Pa. 310, 787 A.2d 292 (2001), reiterated prejudice is presumed when an actual conflict of interest burdens counsel, and this is only if a defendant shows counsel actively represented conflicting interests and the actual conflict adversely affected counsel's performance. *Spotz*, [896 A.2d at 1232].

*Id.* at 563 (citations omitted). After describing the relevant facts, the court held as follows:

We conclude the PCRA court erred in finding the failure to cross-examine Berlan about this matter was reversible error. First, as indicated above, Berlan was Frey's witness, and Berlan's purpose in testifying was to recount Tucker's statement that *Frey* was *not* present. The trial court clearly reiterated this in its curative statement, which only "cured" a statement otherwise present in evidence at trial and known to the jury—the Smalls were present at the Smith murder scene. The jury is presumed to have followed the court's instruction.

Second, it is unclear what value Attorney Evanick could have gained for [Petitioner] from cross-examining Berlan in this regard. Berlan was informally providing police with some information on crimes in the area after Tucker made his 1993 statement. The fact Berlan did not specifically mention Tucker's 1993 statement when informally informing police of crimes does not rise to the level of such a conflict of interest that it prejudiced [Petitioner]. Tucker's 1993 statement is highly valuable for Frey as it does not place Frey at the murder scene. However, Tucker's statement, and the fact Berlan did not relay it to police earlier, is not as obviously valuable to [Petitioner]. The only negative for [Petitioner] from Berlan's trial testimony is he mentioned the Smalls were at the crime scene. But Attorney Evanick quickly objected, and the trial court provided a lengthy curative instruction (which the jury is presumed to follow) of already known information. If Berlan was cross-examined as to why he did not mention Tucker's 1993 statement to police, he might have said he simply forgot, or since he was only informally helping the police, he did not tell them; there could have been any number of different reasons. Ultimately, this uncertainty only allows us to conclude such cross-examination might have helped [Petitioner]. And even if it would have helped him, we are uncertain to what degree it would have

> helped.    Consequently,  we  conclude  [Petitioner]  has  not  shown  Attorney
> Evanick had a conflict of interest creating prejudice to require vacating the guilty
> verdict and holding a new trial, and direct appeal counsel was not ineffective
> for failing to raise this claim.

*Id.* at 564 (citation omitted).  In a footnote, the court added: "As a supervisory matter, the

better course would have counsel seek to withdraw from the representation upon learning a

former client will be testifying against a current client."  *Id.* at 564 n.6.  A concurring opinion

stated that, "pursuant to U.S. Supreme Court decisional law, a defendant alleging a conflict

of interest in a successive representation case may be required to establish *Strickland*

prejudice, rather than merely demonstrate that, at the time of his trial, his counsel actively

represented conflicting interests and that such conflict adversely affected counsel's

performance."  *Id.* at 580 (Castille, C.J., concurring) (footnote omitted) (citing *Mickens v.*

*Taylor,* 535 U.S. 162, 174-76 (2002)).  The concurring justice joined the approach of the

majority opinion on the understanding that it "seems to apply this standard."  *Id.*

### b.    Analysis

The Pennsylvania Supreme Court adjudicated the merits of the conflict of interest

claim, and therefore AEDPA deference applies.  Petitioner asserts that (1) the state court

decision is contrary to and an unreasonable application of *Cuyler v. Sullivan,* 446 U.S. 335,

insofar as it required him to show actual prejudice under *Strickland*, and (2) the state court

unreasonably applied *Strickland* and based its decision on an unreasonable determination

of the facts by speculating that the testimony not elicited from Berlan might not have been

helpful.  (Doc. 36 at 51-54).  The Court is unpersuaded.

First, one plausible reading of the state court decision is that it both identified and reasonably applied the *Sullivan* standard. Under *Sullivan*, a defendant must establish that "an actual conflict of interest adversely affected his lawyer's performance." *Sullivan*, 446 U.S. at 350. The state court identified *Sullivan* and correctly described this standard by stating that "prejudice is presumed when an actual conflict of interest burdens counsel, and this is only if a defendant shows counsel actively represented conflicting interest and the actual conflict adversely affected counsel's performance." *Small-II*, 980 A.2d at 563. The discussion that follows can be understood as addressing whether Evanick's performance was adversely affected, with uncertainty as to how Berlan might have responded being relevant to that issue.

If the state court was applying the *Sullivan* standard, the Court cannot conclude that it did so unreasonably. Petitioner argues that the conflict of interest prevented Evanick from attempting to impeach Berlan with his failure to relate his conversation with Tucker to police at a time it would have helped him. (Doc. 36 at 46). The state court pointed out that "it is unclear what value Attorney Evanick could have gained for [Petitioner] from cross-examining Berlan in this regard." *Small-II*, 980 A.2d at 564. In the absence of any evidence as to how Berlan would have responded, it was not unreasonable to question whether the impeachment strategy would have been helpful. *See Eisemann v. Herbert*, 401 F.3d 102, 109 (2d Cir. 2005) (absence of evidence showing witness would have testified helpfully precluded claim that calling witness was viable alternative defense strategy); *see*

also Taylor v. Superintendent Dallas SCI, No. 23-2511, 2024 WL 4449417, at *6 (3d Cir. Oct. 9, 2024) (petitioner failed to show adverse effect because he did not identify helpful information counsel may have withheld for fear of breaching duty to former client or how that information would have helped the defense).

Second, the Supreme Court has not held that the *Sullivan* presumed prejudice standard extends to conflicts arising from successive representation.  In *Mickens*, the Court declined to "rule upon the need for the *Sullivan* prophylaxis in cases of successive representation," stating that "[w]hether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question."  *Mickens*, 535 U.S. at 176.  Therefore, it would not be an unreasonable application of clearly established federal law for the state court to require Petitioner to meet the *Strickland* prejudice standard. *See Noguera v. Davis*, 5 F.4th 1020, 1035-36 (9th Cir. 2021) (*Sullivan* standard "applies to conflicting *concurrent* representations [b]ut there is no clearly established law that *successive* representation constitutes an 'actual conflict' that we would assess under the *Sullivan* standard") (citation omitted); *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 844 (6th Cir. 2017) (same); *but cf. Harmer v. Superintendent Fayette SCI*, No. 19-3146, 2021 WL 3560666, at *3 n.6 (3d Cir. Aug. 12, 2021) (assuming without deciding that *Sullivan* applies to successive representation where parties agreed it was the applicable standard).

Third, the Court disagrees with Petitioner's contention that it was unreasonable for the state court to speculate that Berlan's testimony might not have been helpful because the state court record was not fully developed. (*See* Doc. 36 at 53-54). Under *Strickland*, it is Petitioner's burden to show that questioning Berlan about his failure to tell Hanover police of his conversation with Tucker would have created a reasonable probability of a different outcome. Petitioner was afforded an opportunity to develop the record on this issue. The PCRA court ruled that the conflict of interest claim could be addressed in the evidentiary hearing and allowed testimony from O'Brien about the claim. (Doc. 115-5 at 148; NT 7/20-23/04 at 193:10-194:24). Petitioner has not shown that the PCRA court would have prevented him developing any further evidence he believed was necessary to support the claim.

The Court will deny Petitioner's request for an evidentiary hearing to demonstrate *Strickland* prejudice. (Doc. 36 at 45, 54). If the record is incomplete, it is because Petitioner "failed to develop the factual basis of [the] claim in State court proceedings." 28 U.S.C. § 2254(e)(2). Because Petitioner has not shown that he can satisfy the exceptions of § 2254(e)(2), an evidentiary hearing is not authorized. *See Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713, 722 (3d Cir. 2022).

For the above reasons, the Court concludes that the Pennsylvania Supreme Court reasonably applied the relevant Supreme Court precedent and did not unreasonably determine the facts. The Court will deny relief on Claim III.

### 5.     Claim VII.A – Failure to impeach Linda Rhinehart

Claim VII.A alleges that trial counsel failed to do enough to impeach Linda

Rhinehart's testimony. (Doc. 1 ¶¶ 222-29). Rhinehart testified that that she overheard

Petitioner make incriminating statements within earshot of an older gentleman who served

her pizza at the counter of a local arcade. (NT Trial at 831:12-832:7, 841:10-20). Larry

Bowers, the arcade owner, testified that the individuals who worked at the arcade during the

relevant time period were himself, his mother, and his son. (*Id.* at 1128:3-8). Bowers did

not recall overhearing a conversation about an incident in which a girl was assaulted and

raped, and he would have reported any such conversation to the police. (*Id.* at 1128:9-24).

Petitioner claims that counsel should have established that Bowers was the only

"older" man serving pizza at the time and that he was in a position to hear any statement

that Rhinehart overheard. (Doc. 1 ¶¶ 227-29; Doc. 36 at 56). On PCRA appeal, the

Pennsylvania Supreme Court held that direct appeal counsel was not ineffective for failing

to raise this claim because trial counsel solicited "beneficial testimony that [Bowers] did not

hear an incriminating conversation, and if he had, he would have reported it to police."

*Small-II*, 980 A.2d at 570.

It is unnecessary to address deficient performance or AEDPA deference because

the Court concludes on de novo review that Petitioner has not established prejudice under

*Strickland*. *See Strickland*, 466 U.S. at 697; *Berghuis*, 560 U.S. at 390. The jury heard

Bowers' testimony that he was the only person working at the arcade who met Rhinehart's

description of an older gentleman, as well as Rhinehart's testimony that the older gentleman

was within earshot when she heard Petitioner's statements.  The Court cannot conclude

that the slightly more specific testimony that Petitioner claims counsel should have elicited

from Bowers would have created a reasonable probability of a different outcome.

Petitioner also alleges that trial counsel were ineffective by failing to impeach

Rhinehart with the statement she made to police in 1991, which Petitioner asserts was

inconsistent with her trial testimony. (Doc. 1 ¶¶ 222-26; Doc. 36 at 55-56).  At trial,

Rhinehart described Petitioner's incriminating  statements as follows:

> And John proceeded to say that, Oh, we drove around and partied for awhile,
> she had to pee, so we pulled over to let her go in the woods.  He then said, I
> followed her into the woods 'cause I was going to get some of that, and he
> came back and told his buddies, let's share this.  The first male voice said, No,
> come on, she's not even sharing that with her boyfriend right now.  John sort
> of chuckled.
>
> And that's when I got my pizza to turn around and saw that it was John
> talking, and he made the statement,  She won't be a tease anymore.  It's
> amazing what a tire iron can do to hush someone making that much noise.

(NT Trial at 831:20-832:7).

The statement Petitioner contends was inconsistent with this testimony appears in a

Pennsylvania State Police report signed by Trooper William J. Linker.  (Doc. 26-1 at 16-17).

The report recounts that Rhinehart gave the following statement in an interview on January

22, 1991:

> [Rhinehart] related that she had heard that three guys picked up Cheryl at the
> Melrose Bar or near the bar.  They were riding around supposedly hit her with
> a tire iron, raped her and dropped her off somewhere.  She heard they dropped

one guy off and two of them went back to SMALL's and they told their wives. The wives blew them off as being drunk. No further information was obtained relative to this statement.

(Doc. 26-1 at 17). When asked about her 1991 statement at trial, Rhinehart acknowledged

that she at that time told police that what she heard was a "rumor":

> Q.    Do you recall when you did tell someone about the conversation?
>
> A.    In 1991, when I talked with state police troopers.
>
> Q.    Now, when you talked with the troopers in 1981 [sic], did you tell them what you have testified to here today initially?
>
> A.    I told them that I had heard a rumor around and basically what I stated today, yes.

(*Id.* at 832:22-833:5). On cross-examination by Petitioner's counsel, Rhinehart again

acknowledged this difference between her 1991 statement and her testimony:

> Q.    When you talked to the police in 1991, is it correct you essentially told them what you've told us and Trooper Gano today; is that correct?
>
> A.    Yes.
>
> Q.    And when you described the conversation at that time, did you describe it as what a friend had told you?
>
> A.    I had described it as a rumor I had heard through a friend, yes.
>
> Q.    And the friend had overheard a conversation at What's a Harvey?
>
> A.    Right.
>
> Q.    Then you related what you told us today; correct?
>
> A.    Correct.

(*Id.* at 844:9-23).

Petitioner's counsel also called Trooper Linker and elicited the following testimony about Rhinehart's 1991 statement:

Q.   [W]ith respect to Linda Rhinehart, do you recall interviewing her in 1991?

A.   Yes, sir.

Q.   In the course of that interview, did Linda Rhinehart ever mention a conversation at a place called What a Harvey?

A.   Not to me, she didn't.

Q.   Did she ever mention being at the counter and overhearing a group of people at a picnic table?

A.   No.

Q.   Did she ever describe this statement about somebody going into the woods to urinate?

A.   No, sir.

Q.   Did she tell you in the 1991 interview that these people wound up at the Small's home, did she tell you that?

A.   Yes, sir.

Q.   And that they came home and they told their wives about what happened?

A.   That's correct.

Q.   And that the wives didn't believe them?

A.   Yes, sir.

(*Id.* at 1263:10-1264:6).

Petitioner did not raise this aspect of the claim in his PCRA appeal. (*See* Doc. 115-5 at 86-87). Nonetheless, it is unnecessary to address exhaustion or procedural default because the Court concludes that the claim lacks merit. *See* 28 U.S.C. § 2254(b)(2).

Although Petitioner asserts that Rhinehart's 1991 statement is inconsistent with her 1996 trial testimony, the Court notes that there is significant consistency in the substance of what she said on both occasions. The substance of Rhinehart's 1991 statement was that she "had heard that three guys picked up Cheryl at the Melrose Bar or near the bar [and] were riding around supposedly hit her with a tire iron, raped her and dropped her off somewhere." (Doc. 26-1 at 17). Rhinehart's testimony described a similar scenario, involving a group that "drove around," implications of forced sexual activity, and an account of hitting the victim with a tire iron. (NT Trial at 831:20-832:7). Rhinehart acknowledged that the two accounts differed insofar as her 1991 statement recounted the substance of what she had heard as a "rumor" as opposed to what she directly overheard Petitioner say at the arcade. (*Id.* at 833:1-5, 844:13-17). Rhinehart attributed this to her fear of Petitioner (*id.* at 833:6-10, 1243:24-25), testifying that Trish had told her that she "didn't want to get mixed up with him and his gang" (*id.* at 830:16-19). To the extent that Rhinehart's testimony differed in other respects from her 1991 statement, Petitioner's counsel made the jury aware of those differences through the testimony of Trooper Linker. (*Id.* at 1263:10-1264:6). The

68

Court cannot conclude that there is a reasonable probability of a different outcome if counsel had undertaken further efforts to impeach Rhinehart based on her 1991 statement.

For the above reasons, the Court concludes on de novo review that Petitioner has not demonstrated prejudice under *Strickland*. The Court will deny relief on Claim VII.A.

### 6.    Claim VII.B – Failure to impeach Janice Small based on bias

Claim VII.B alleges that trial counsel were ineffective because they did not impeach Janice Small by showing that she was biased against Petitioner because he failed to pay child support for their son. (Doc. 1 ¶¶ 230-34). As support, Petitioner offers excerpts of court records that he claims show intensifying efforts by Janice Small to collect child support, thereby suggesting that hostility toward Petitioner was her motivation for implicating him in Smith's murder. (*Id.* ¶ 231; Doc. 37-1 at 29-42). On PCRA appeal, the Pennsylvania Supreme Court addressed the claim as follows:

> [Petitioner] claims no evidence was produced at trial showing Janice Small had a motive to lie. [Petitioner] argues trial counsel should have produced documents showing Janice Small filed contempt proceedings related to child support against him. [Petitioner] provides no legal authority in this section of his brief; it is unclear if this evidence would have been admissible at trial. Oddly, he argues his trial counsel should have introduced evidence that child support contempt proceedings were filed against him, yet he also claims counsel was ineffective for not acting to exclude evidence of his involvement in the Sussman burglaries. Essentially, [Petitioner] argues trial counsel should have tried to admit evidence of his alleged prior bad acts in the contempt proceedings, but tried to exclude evidence of alleged prior bad acts regarding the Sussman evidence. We do not find ineffectiveness on the part of direct appeal counsel for not arguing trial counsel were ineffective for failing to introduce evidence of contempt proceedings against [Petitioner].

*Small-II*, 980 A.2d at 570-71.

It is unnecessary to address deficient performance or AEDPA deference because the Court concludes on de novo review that Petitioner has not established prejudice under *Strickland*. *See Strickland*, 466 U.S. at 697; *Berghuis*, 560 U.S. at 390.

The court records Petitioner offers to support this claim do not, on their face, establish anything more than efforts by Janice Small to collect the child support she was owed. While Petitioner claims that "the dispute between the parties was so bitter that Janice initiated contempt proceedings" (Doc. 61 at 34-35), the records do not indicate whether Janice Small made this decision, as opposed to the domestic relations caseworker assigned to the case. (*See* Doc. 37-1 at 40). Moreover, the records could be understood as evidence that it would serve Janice Small's financial interests for Petitioner to avoid incarceration so that he could work and provide child support. The Court concludes that Petitioner has not demonstrated a reasonable probability of a different outcome if his counsel had attempted to impeach Janice Small with the child support records he offers in support of this claim.

For the foregoing reasons, the Court concludes that Petitioner has not demonstrated prejudice under *Strickland*. The Court will deny relief on Claim VII.B.

### 7.    Claim VII.C – Failure to present evidence of culpability of others

Claim VII.C alleges that trial counsel were ineffective by failing to investigate and present evidence that two other individuals, Andy Tucker and Tony Rice, admitted killing

70

Smith.  (Doc. 1 ¶¶ 235-40).  On PCRA appeal, the Pennsylvania Supreme Court addressed the claim as follows:

> [Petitioner] argues trial counsel failed to present admissions by others. [Petitioner] summarizes these statements, again cites no legal authority, and summarily states trial counsel did not make a strategic decision not to present this evidence.  Since [Petitioner] offers nothing else, he has not met his burden of proving direct appeal counsel's ineffectiveness regarding this issue.

*Small-II*, 980 A.2d at 571.  This is an adjudication of the merits of the claim that is entitled to AEDPA deference.[8]

Petitioner does not argue that the state court's decision is legally or factually unreasonable under § 2254(d).  (*See* Doc. 36 at 59).  Having reviewed the record, the Court finds no reason to reach this conclusion.  Petitioner made no argument in his PCRA appellate brief concerning prejudice and his argument on deficient performance was limited to the assertion that his trial counsel did not make a strategic decision not to present evidence of the alleged admissions.  (*See* Doc. 115-5 at 76).  Based on the limited information Petitioner offered, it was not unreasonable for the state court to conclude that he did not establish either deficient performance or prejudice.  *See Williams*, 45 F.4th at 726 (the "strong presumption of reasonableness" that applies to counsel's performance must be

---

[8]    The Court rejects the Commonwealth's contention that this claim is procedurally defaulted because Petitioner did not fairly present it to the state court.  (*See* Doc. 50 at 24-25).  Petitioner's PCRA appellate brief argued that trial counsel was ineffective and described the factual basis for the claim.  (Doc. 115-5 at 89-90).  This was sufficient to give the state courts the opportunity to pass on the merits of the federal constitutional claim.  *See Velazquez v. Superintendent Fayette SCI*, 937 F.3d 151, 160 (3d Cir. 2019).  The language used by the state court in rejecting the claim, that Petitioner "has not met his burden of proving direct appeal counsel's ineffectiveness," *Small-II*, 980 A.2d at 571, indicates the state court was addressing the merits rather than finding the claim to be waived.

overcome by "case-specific evidence of negligence"); *Rolan v. Vaughn*, 445 F.3d 671, 682

(3d Cir. 2006) (showing of *Strickland* prejudice may not be based on mere speculation

about what witnesses counsel failed to locate may have said).

For these reasons, the Court concludes that the state court reasonably applied the

relevant Supreme Court precedent and did not unreasonably determine the facts.  The

Court will deny relief on Claim VII.C.

8.    **Claim VII.D – Failure to object to prejudicial evidence**

Claim VII.D alleges that Petitioner's trial counsel were ineffective because they failed

to object to irrelevant and prejudicial evidence the Commonwealth offered to support the

attempted rape charge.  (Doc. 1 ¶¶ 241-44).  On PCRA appeal, the Pennsylvania Supreme

Court addressed the claim as follows:

> [Petitioner] claims three Commonwealth witnesses provided inadmissible
> testimony to bolster the Commonwealth's argument that [Petitioner] and Frey
> attempted to rape Smith.  [Petitioner] refers to Trish's testimony that although
> she was intoxicated and passed out, she recalled [Petitioner] making sexual
> advances toward her.  Michelle Starling testified she heard [Petitioner], Charles
> Small, and Frey talking about "pussy," and she feared she might be raped or
> killed.  [Smitty] testified he thought the men in the woods were raping and
> hurting Smith.
>
> Again, [Petitioner] cites no legal authority in this regard, and after referring to
> this testimony, summarily concludes this evidence was speculative and
> inadmissible.  Since [Petitioner] offers nothing else, he has not met his burden
> of showing direct appeal counsel's ineffectiveness.

*Small-II*, 980 A.2d at 571. This is an adjudication of the merits of the claim that is entitled to AEDPA deference.[9]

Petitioner does not argue that the state court's decision is legally or factually unreasonable under § 2254(d).  (*See* Doc. 36 at 60).  Having reviewed the record, the Court finds no reason to reach that conclusion.  In particular, Petitioner has not demonstrated that the objections he claims counsel should have made were meritorious under state law or that there is a reasonable probability of a different outcome if the evidence had been excluded.

For these reasons, the Court concludes that the state court reasonably applied the relevant Supreme Court precedent and did not unreasonably determine the facts.  The Court will deny relief on Claim VII.D.

9.    **Claim VII.E – Failure to impeach Mary Trish with reputation for untruthfulness**

Claim VII.E alleges that Petitioner's trial counsel were ineffective because they failed to impeach Mary Trish with her reputation for untruthfulness.  (Doc. 1 ¶¶ 245-48).

At the PCRA hearing, Nancy Hoffman, Trish's former mother-in-law, testified that Trish had a reputation for untruthfulness.  (NT 7/20-23/04 at 495:2-17).  On cross-examination, Hoffman identified the community of people she knew who also knew

---

[9]    The Court rejects the Commonwealth's contention that this claim is procedurally defaulted because Petitioner did not fairly present it to the state court.  (*See* Doc. 50 at 25-26).  Petitioner's PCRA appellate brief fairly presented the claim by describing its factual and legal basis. (Doc. 115-5 at 88-89); *see Velazquez*, 937 F.3d at 160.  The language used by the state court in rejecting the claim, that Petitioner "has not met his burden of proving direct appeal counsel's ineffectiveness," *Small-II*, 980 A.2d at 571, indicates that the state court was addressing the merits rather than finding the claim to be waived.

Trish as Hoffman's father and four siblings and Trish's parents and five siblings. (*Id.* at

496:2-8, 497:3-20). Hoffman had not discussed Trish's reputation for truthfulness with

these individuals prior to 1996 but thought that they felt the same way she did. (*Id.* at

497:25-498:10). Hoffman acknowledged that she was angry with Trish in 1996 over

incidents relating to Trish's children. (*Id.* at 499:2-6).

O'Brien testified that evidence of Trish's reputation for untruthfulness would have

been helpful to the defense if it could have been admitted and that he did not recall a

strategic decision not to call Hoffman to testify. (*Id.* at 157:16-21, 185:2-6). Evanick

testified that it would have been helpful to impeach Trish and that Pennsylvania law

provided for impeachment by proof of a reputation for untruthfulness. (*Id.* at 384:3-5,

15-18).

On PCRA appeal, the Pennsylvania Supreme Court addressed the claim as follows:

[Petitioner] argues several witnesses, including Hoffman, could have testified
to Trish's reputation. However, he does not assert how trial counsel knew or
should have known of the witnesses, or if the specific witnesses were available
at trial. Further, [Petitioner] concedes trial counsel impeached Trish with prior
inconsistent statements and her drug and alcohol abuse when the Smith
murder occurred. Because [Petitioner] fails to show trial counsel knew or
should have known of several witnesses and that those witnesses were
available to testify, and trial counsel extensively impeached Trish, trial counsel
was not ineffective in this regard. Thus, direct appeal counsel was not
ineffective for not raising this issue on direct appeal.

*Small-II*, 980 A.2d at 571.

It is unnecessary to address deficient performance or AEDPA deference because the Court concludes on de novo review that Petitioner has not established prejudice under *Strickland*. *See Strickland*, 466 U.S. at 697; *Berghuis*, 560 U.S. at 390.

Trish testified that Petitioner was part of the group at the Pines the night of Smith's murder and that he made sexual advances toward her over the course of the evening. (NT Trial at 254:24-255:2, 258:14-259:9). Trish could offer no other observations because she passed out from drinking after arriving at the Pines and remembered nothing else until waking up in her bed the next morning. (*Id.* at 255:5-256:3).

Trish was thoroughly impeached based on her alcohol use and her prior inconsistent statements. Trish admitted that she may have consumed as much as eight shots of whiskey and six beers during the course of the evening that ended at the Pines. (*Id.* at 250:13-17, 253:24-254:1, 285:5-16, 286:16-22). G. Thomas Passananti, an expert toxicologist called during Frey's defense, testified that a person of Trish's age and weight who consumed the amount of alcohol she reported would have been "well into the stupor stage of intoxication." (*Id.* at 914:11-25). Trish admitted that she only told police the version of events she testified to on May 13, 1995, despite being interviewed on 10 to 20 prior occasions. (*Id.* at 256:18-257:6). Three witnesses – Shirly Runkle, and former Troopers Richard Amour and William Linker – testified that Trish told them some version of a story in which she and Smith went to the Melrose Tavern on or about August 8, 1981, and Smith left with two Puerto Rican males. (*Id.* at 1170:18-1171:3, 1184:5-1185:21, 1204:5-7,

1207:21-1208:7).  Amour and Runkle also testified that Trish told them she had seen Smith on August 13, 17, or 18, 1981, after the night they went to the Melrose Tavern.  (*Id.* at 1179:5-11, 1186:1-5).

In closing argument, Evanick urged the jury to consider whether Trish was "flat-out lying to you" and argued that it was "ludicrous" that Trish had a clear recollection of the night at the Pines after consuming the amount of alcohol she described.  (*Id.* at 1378:17-19, 1380:3-9).

Given the limited significance of Trish's testimony and the extensive impeachment by other means, Petitioner has not shown a reasonable probability of a different outcome if the jury had heard the testimony Hoffman offered at the PCRA hearing.  For these reasons, the Court concludes that Petitioner has not demonstrated prejudice under *Strickland*.  The Court will deny relief on Claim VII.E.

**C.    Claims Relating to Acquittal of Charles Small and Evidence that Petitioner Assaulted Hanna Sussman (Claims IV.B, IV.C, X, XVIII)**

Claims IV.B, IV.C, X, and XVIII allege due process and ineffective assistance of counsel claims based on the Commonwealth's conduct in connection with the acquittal of Charles Small and the admission of evidence that Petitioner and Charles Small assaulted Hanna Sussman.  (Doc. 1 ¶¶ 162-78, 274-99, 430-39).  The Court will first describe the relevant factual background and then address the individual claims.

### 1.    Relevant background

At trial, the Commonwealth initially proceeded on the theory that Charles Small participated in Smith's murder.  In his opening statement, the prosecutor asserted that Tucker would testify that Charles Small was at the Pines and accosted Smith along with Petitioner and Frey, that Charles Small and Petitioner then returned to Petitioner's trailer, where Janice and Kathy Small were present, and that Janice Small would testify that she heard them say that they hit some girl on the head and thought they killed her.  (NT Trial at 66:4-6. 67:23-68:13).  In response, Charles Small's counsel told the jury that Charles Small would not deny that he and Petitioner "were involved with a crime involving a woman who was injured," but that the evidence would show that Charles Small was working in Florida at the time of Smith's murder.  (*Id.* at 100:4-10, 20-25, 101:1-2).

The Commonwealth's case against Charles Small encountered difficulty when Tucker testified that he did not recall seeing Charles Small at the Pines and that as far as he knew Charles Small was not involved in Smith's murder.  (*Id.* at 651:4-7, 679:10-12, 707:14-20).  Smitty also testified that he did not recall Charles Small being at the Pines, despite having previously testified at the preliminary hearing that Charles Small was part of the group that followed Smith into the woods and returned without her.  (*Id.* at 550:24-551:16. 552:5-8, 25, 553:1-12, 555:21-556:4, 25, 557:1-7, 13-15).

In addition, while the trial was underway, the Commonwealth discovered documentation that supported Charles Small's alibi.  On Monday, May 20, 1996, after the

Commonwealth rested its case, the prosecutor informed the trial court and defense counsel that Trooper David Hatfield had traveled to Florida the previous Thursday, May 16, and returned on Saturday, May 18, with paperwork that showed Charles Small was working in Florida on August 6, 1981. (*Id.* at 871:10-13, 882-87).

Before Charles Small began his defense, Evanick raised what he described as a "novel" issue, in that he had learned that the Commonwealth had made an "arrangement" to join in a motion for acquittal after Charles Small presented his defense. (*Id.* at 971:10-17). Evanick argued that the Commonwealth was "making Charles Small and his defense team agents of the Commonwealth, because what they are seeking to do is to rehabilitate themselves in front of the jury." (*Id.* at 971:18-22). Evanick acknowledged that he could offer no legal authority that prevented this conduct. (*Id.* at 972:14-17). In response, the trial court stated:

> You can on cross examination bring all of that out and let the jury decide what credibility to give to its testimony, if, in fact, that is what was agreed to. I see no legal impediments to what they're doing, as long as a full and complete disclosure and the jury assesses the situation.

(*Id.* at 972:18-24).

As part of his defense, Charles Small offered evidence to establish that the incident described by Janice Small did not occur on the night of Smith's murder. Donald Jeffries, Charles Small's former parole agent, testified that Charles Small was convicted of charges arising from an incident on August 28, 1981, in which Hanna Sussman was struck on the head with a billy club after Charles Small and Petitioner entered her home on false

78

pretenses. (*Id.* at 982:2-14, 983:3-8). Jeffries testified that Charles Small admitted being in Sussman's home but stated that it was Petitioner who struck her. (*Id.* at 982:15-19). Evanick cross-examined Jeffries, eliciting that Sussman had testified in Charles Small's parole violation hearing that she pretended to be unconscious to avoid further harm. (*Id.* at 986:10-987:1).

Charles Small and Kathy Small testified about an episode similar to that recounted by Janice Small that occurred following the Sussman incident. Kathy Small testified that Petitioner and Charles Small came into Petitioner's home around 6:00 p.m. and went into the bathroom, where Charles Small shaved off his beard and mustache. (*Id.* at 997:3-998:2). Charles Small initially told her that he did this because he thought somebody had seen him during a breaking and entering and later told her that "they went into a place and they struck a woman in the head." (*Id.* at 998:7-24). Charles Small testified that sometime in August 1981 he broke into the Sussman home, that Sussman was struck on the head during that incident, and that he then returned to Petitioner's home, where Kathy Small and Janice Small were present, and shaved his beard and cut his hair. (*Id.* at 1025:3-1026:5).

Kathy Small and Charles Small also testified that they were living and working in Florida until August 8, 1981. (*Id.* at 992-95, 1016-24). In addition, the parties stipulated to the authenticity of the documentation that Hatfield retrieved and verified during his trip to Florida. (*Id.* at 1011:14-1013:13).

79

Evanick objected at one point during Charles Small's testimony when the prosecutor began to ask whether he had any discussion with anyone. (*Id.* at 1032:15-18). Evanick argued that the question was outside the scope of direct examination and "part of the little agreement they already have worked out for Charles." (*Id.* at 1032:25-1033:8). The trial court responded:

> The trouble, Mr. Evanick, is you object to portions of the testimony from Charles Small that doesn't help your case, and you let in that that helps your case. You even cross-examined his witnesses.
>
> Now we're at a point where you've gotta decide which way the rules are going to be played.

(*Id.* at 1033:9-15). The trial court overruled the objection (*id.* at 1034:9-12), but offered to instruct the jury that it could not consider the evidence offered by Charles Small in the case against Petitioner:

> I can instruct the jury that, and this is where I need help, that nothing that you have – nothing that has occurred in the testimony of the Charles Small witnesses is to be considered in any way in the John Small case, although I think you want bits and pieces of it to be considered in the Charles Small case. And how am I going to deal with that?

(*Id.* at 1034:13-19). Evanick merely stated "Proceed" and did not pursue the matter further. (*Id.* at 1034:25).

After Charles Small presented his defense, he moved for judgment of acquittal, joined by the Commonwealth, which was granted by the trial court. (*Id.* at 1038:1-3, 1051:10-15, 1055:7-1056:11). With the parties' agreement, the trial court informed the jury of this development and that the Commonwealth had concluded that the evidence

established that Charles Small was in Florida on August 5 and 6, 1981 and not in Hanover. (*Id.* at 1057:14-1058:15).

In closing argument, Evanick began by describing the Commonwealth joining in the motion for acquittal of Charles Small as one of the "significant events that occurred in this trial" because it "has impacts on their case and says much about the truthfulness and the ability of their witnesses to recall these events in question." (*Id.* at 1363:7-13). Evanick continued by highlighting the effect of the acquittal on Janice Small's testimony:

> Now, what's the effect of the Commonwealth saying Charles Small should be acquitted, we move for a directed verdict? Well, number one, Janice Small is wrong that the events that took place on August 28th when Charles and John came home that evening related to the death of Cheryl Smith. Now, they're going to try and change that around a little, and we'll deal with that later on, but those initial events of Charlie and Johnny coming home have nothing to do with the death of Cheryl Smith.

(*Id.* at 1363:23-1364:8). More generally, Evanick argued, "probably most importantly, the acquittal of Charles Small says something about the quality and the manner in which this investigation was conducted from 1991 onward." (*Id.* at 1365:16-19). At a later point, Evanick invoked the Sussman burglary as a springboard to argue why the jury should not credit any of Janice Small's testimony. (*Id.* at 1381:19-1383:20). Evanick also argued that the acquittal should cause the jury to question the integrity of the police investigation:

> Don't ever forget that the Commonwealth got four people in here to say that Charles Small was at that crime scene. People who had repeatedly said they didn't know anything about it, didn't have any recollection, either because of drugs and alcohol or for other reasons had no memory of these events in question, and they got four people to come in here, take an oath to swear to

tell the truth, and say Charles Small was there, Charles Small was a passenger in that car that night.

Now, unfortunately, – unfortunately for the Commonwealth and fortunately for Charles, somebody finally looked at it and said Charles wasn't in that car that night.  It's another consequence of this acquittal of Charles Small.  The police pressured, forced, and cajoled witnesses in this case. Sometimes they had to use just a little pressure, sometimes they had to use a lot.

You've heard all of these people describe those events.  After they found Janice Small, they denied what happened, and they set out to prove it, because Janice Small said John and Charles came home, we had to have a scenario that included John and Charles, we set out to find a bunch of people who were willing to come in here and testify under oath that that was correct. And they did that.

(*Id.* at 1386:9-1387:9).

In response, the prosecutor acknowledged that Charles Small was "a mistaken identity" and that the witnesses who said he was at the Pines were mistaken.  (*Id.* at 1424:6-7, 1447:4-5).  He also stated, "We now know that Charlie and Johnny did come into the apartment after the Sussman burglary on the 28th of August and they did confirm talking about hitting someone on the head, perhaps killing them."  (*Id.* at 1448:2-6).

The trial court addressed the Sussman evidence in its jury instructions, initially instructing as follows:

Now, you've heard evidence that might tend to prove that the defendants were guilty of improper conduct for which they are not on trial, and I'm speaking of the testimony to the effect, if you believe it, about John – the testimony that John Small and Charles Small shaved their facial hair and cut the length of their other hair.  The Commonwealth, as I understand, introduced that testimony for the purpose of intending to show consciousness of guilt.

The defendants argue that that did not occur at a time frame that could possibly have exhibited consciousness of guilt here, because that happened, according to the defendants' explanation, in the Sussman – after the Sussman matter. So Janice Small's testimony tying that, if it did tie – if you find that it did tie it to the Sussman matter, then this would have absolutely no application to it. If you find Janice Small's testimony – you've heard the arguments of the attorneys here, whether or not it's relevant to the crimes which are now before you, then you may consider it if you choose as consciousness of guilt.

Now, let me explain the context in which you hear it. This evidence is not before you as evidence they have committed this crime. Let's make that very, very clear, and you must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt. If you find [Petitioner] guilty, it must be because you are convinced beyond a reasonable doubt that he committed the crime charged and not because you believe he committed the Sussman offense or that he cut his hair or shaved his beard.

(*Id.* at 1474:6-1475:15). Evanick objected to this instruction, stating, "I think you got

confused, because the prior bad acts are not the cutting of the hair. The prior bad acts were

the actual burglaries." (*Id.* at 1504:4-7). The court responded that it had given the

instruction discussed with Evanick the previous evening but offered to correct it, to which

Evanick responded, "Fine." (*Id.* at 1504:8-17) The court reinstructed the jury as follows:

When I gave you the charge, the instruction about prior conduct as from which you might infer evidence of guilt, I was speaking about the cutting of the hair, do you remember, and the shaving of the beard. Disregard that. Erase it from your minds. And what that charge is intended to cover is the testimony that you hear about John Small and, I guess, Charles Small were involved in some – with a Sussman, in charges of burglary.

And that evidence, that testimony about John Small being involved in that charge of burglary is before you for a limited purpose, only to show the context of the other testimony that arose at that time. This evidence, the fact that the burglaries, testimony about the burglaries and the Sussmans, must not

be considered by you in any way other than for that purpose, the context of the other things, conversation, so on.

> You must not regard this evidence, the burglaries, as showing that John Small is a person of bad character or criminal tendencies from which you might be inclined to infer guilt. If you find the defendant guilty, it must be because you are convinced by the evidence that he, John Small, committed the crimes charged, and not because you believe he is wicked or committed that burglary crime involving the Sussmans.

(*Id.* at 1509:19-1510:20).

In the penalty phase, the trial court gave the following instruction concerning the jury's use of evidence admitted in the guilt phase:

> Now, you'll recall in the trial that you heard – and incidentally, you'll remember that everything you heard in the trial has been evidence which is incorporated into this sentencing hearing, so any evidence you heard during the trial that bears on the enumerated aggravating circumstances or you find provides any mitigating circumstances may be used by you in deciding what are the aggravating factors proven by the Commonwealth beyond a reasonable doubt and what are any mitigating circumstances proved by either of the defendants by preponderance of the evidence.

(NT 5/28/96 at 104:6-17).

### 2.    Claim IV.B – Prosecutorial misconduct in eliciting misleading testimony from Janice Small

Claim IV.B alleges that the Commonwealth violated Petitioner's right to due process under *Napue v. Illinois*, 360 U.S. 264 (1959), because the prosecutor falsely portrayed Janice Small's account of Petitioner saying that he and Charles Small thought they killed a girl as relating to Smith's murder. (Doc. 1 ¶¶ 162-72). In *Napue*, the Supreme Court held that a conviction knowingly "obtained through the use of false evidence" violates the

Fourteenth Amendment's Due Process Clause. *Napue*, 360 U.S. at 269. "To establish a

*Napue* violation, a defendant must show that the prosecution knowingly solicited false

testimony or knowingly allowed it 'to go uncorrected when it appear[ed].'" *Glossip v.*

*Oklahoma*, 145 S. Ct. 612, 626 (2025) (quoting *Napue*, 360 U.S. at 269).

In his opening statement, the prosecutor argued that Janice Small's testimony would

provide evidence of Petitioner's guilt and previewed the testimony as follows:

> These people go home. John Small and Charlie Small go back to John
> Small's trailer where he was living, and present at the trailer are Kathy Small,
> who is still married to Charles, and Janice Small, who was then married to John,
> and I believe their small infant child was present at that time. Janice Small
> divorced John later. And you'll hear Janice describe them coming into the
> trailer and being excited, her observing blood on John Small, his hands, hear
> them being wiped, that they were excited, that they went into the bathroom and
> they cut their hair and they shaved their beards and facial growth, cleaned
> themselves up. And you will hear them acknowledge, admit through the
> testimony of Janice Small that they hit some girl on the head, thought they killed
> her.

(NT Trial at 67:23-64:13). In closing argument, the prosecutor acknowledged that the

incident Janice Small described occurred after the Sussman burglary, stating, "We now

know that Charlie and Johnny did come into the apartment after the Sussman burglary on

the 28th of August and they did confirm talking about hitting someone on the head, perhaps

killing them." (*Id.* at 1448:2-6).

On PCRA appeal, the Pennsylvania Supreme Court held that the *Napue* claim

lacked merit and therefore direct appeal counsel was not ineffective for failing to raise it on

direct appeal. *Small-II*, 980 A.2d at 566. The court reasoned that "Janice Small potentially

mistaking which incident the Small brothers returned home from, when testifying to an event occurring nearly 15 years earlier, is obviously not the solicitation of patently false or perjured testimony." *Id.* This is an adjudication of the merits that is entitled to AEDPA deference.

The Court concludes that there is no basis for disturbing the Pennsylvania Supreme Court's decision. Petitioner has not shown that the Commonwealth "knowingly solicited false testimony or knowingly allowed it 'to go uncorrected when it appear[ed].'" *Glossip*, 145 S. Ct. at 626 (quoting *Napue*, 360 U.S. at 269). On direct examination by the Commonwealth, Janice Small was asked, "Now, did there come an occasion in the late summer for some unusual event that occurred at your residence?" (NT Trial at 774:8-10). Ms. Small testified that she was "not sure of the exact date," but agreed when the prosecutor asked, "Can we say August of 1981?" (*Id.* at 774:12-15). She then proceeded to tell the story of an "occasion in the late summer for some unusual event that occurred at [her] residence." (*Id.* at 774-82). Ms. Small recounted the statements Petitioner made on this "occasion" but did not associate them with a named victim. (*See id.* at 776:3-4, 18-19, 782:11-13). Petitioner has not shown that this testimony was false in any respect.

Petitioner asserts that, even if Janice Small did not know that her testimony was misleading, the prosecutor "presented her testimony *as if* it related to the homicide," despite knowing that Janice Small "could only either be (1) lying, or (2) referring to the burglary and assault, *not* the homicide." (Doc. 36 at 75-76 (emphasis in original)). This argument fails for two reasons.

First, it is based on the assumption that all of the statements made by Petitioner during the occasion Janice Small described related to the Sussman incident.  That assumption is not supported by the record.  Janice Small testified that Petitioner and Charles Small talked about events other than the Sussman assault during the occasion she described.  (NT Trial at 782:5-7).  Moreover, there was no basis for inferring that Petitioner's statement "that they thought they killed someone, left her – dumped her in the woods" (*id.* at 782:12-13), referred to the Sussman assault because there was no evidence that Sussman was either "killed" or "dumped . . . in the woods."

Second, even if the prosecutor's opening statement suggested that Janice Small would describe events that took place on the night of Smith's murder, he did not allow that suggestion "to go uncorrected." *Napue*, 360 U.S. at 269.  In closing argument, the prosecutor made clear that the "occasion" recounted by Janice Small described events that occurred after the Sussman assault, stating, "We now know that Charlie and Johnny did come into the apartment after the Sussman burglary on the 28th of August and they did confirm talking about hitting someone on the head, perhaps killing them."  (NT Trial at 1448:2-6).

For these reasons, the record provides no basis for the Court to conclude that the prosecutor "knowingly solicited false testimony or knowingly allowed it 'to go uncorrected when it appear[ed].'"  *Glossip*, 145 S. Ct. at 626 (quoting *Napue*, 360 U.S. at 269).  Therefore, the Court concludes that the Pennsylvania Supreme Court reasonably applied

*Napue* in rejecting Petitioner's claim and that its adjudication of the claim did not result in a decision that is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Court further concludes that the Pennsylvania Supreme Court's decision is not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Court will deny relief on Claim IV.B.

> ### 3.    Claim IV.C – Prosecutorial misconduct in forcing Charles Small to present his defense

Claim IV.C alleges that the Commonwealth violated Petitioner's right to due process by forcing Charles Small to present his defense to secure the admission of the otherwise inadmissible evidence of the Sussman assault and to establish that Charles Small and his brother Peter Small were often mistaken for each other for the purpose of rehabilitating the witnesses who testified that Charles Small was present at the crime scene. (Doc. 1 ¶¶ 173-78). Petitioner also alleges that trial counsel were ineffective because they failed to properly object to the Commonwealth's misconduct and that direct appeal counsel was ineffective for failing to raise the issue on direct appeal. (*Id.* ¶ 201).

On PCRA appeal, the Pennsylvania Supreme Court addressed these claims as follows:

> [Petitioner] argues the Commonwealth's decision regarding Charles Small prejudiced him, and [Petitioner's] counsel was ineffective for not objecting to the continued prosecution of Charles Small. Other than a brief reference to

*Berger v. United States*, 295 U.S. 78, 88 (1935), [Petitioner] provides no legal authority to support this argument.  [Petitioner] has the burden of showing ineffectiveness; since he only briefly references *Berger*, he has not carried this burden.

*Small-II*, 980 A.2d at 566-67 (citations omitted).

For the reasons discussed below, the Court concludes that the claims lack merit. Therefore, it is unnecessary to address the Commonwealth's assertion of procedural default (*see* Doc. 50 at 32) or whether AEDPA deference applies.  *See* 28 U.S.C. § 2254(b)(2); *Berghuis*, 560 U.S. at 390.

To establish a violation of due process, Petitioner must demonstrate that prosecutorial misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  The Third Circuit has held that Supreme Court precedent requires the reviewing court to "examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

Petitioner asserts that he was prejudiced because the Commonwealth's misconduct allowed the jury to hear the otherwise inadmissible evidence of the Sussman assault.  The Court disagrees.  First, the trial court's instruction expressly forbade the jury to consider that evidence to show Petitioner's bad character or to infer that he was guilty of Smith's murder. "It is well established that, absent extraordinary circumstances, jurors are presumed to

89

follow the instructions given them by the court." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d

Cir. 2014). Petitioner's briefing of this claim offers no reason to disregard this

well-established presumption. (*See* Doc. 36 at 76-79; Doc. 61 at 44-47). Second,

Petitioner's counsel used the Sussman evidence to discredit the quality of the investigation

and to argue that the witnesses who claimed to have seen both Charles Small and

Petitioner at the Pines were either mistaken or lying.

      With respect to Petitioner's contention that the Commonwealth's purpose was to

secure evidence that Charles Small and his brother Peter Small were often mistaken for

each other, the Court notes that the Commonwealth elicited testimony on that subject in its

own case, which was then further explored by defense counsel on cross-examination. (NT

Trial at 480:11-13, 482:6-483:4, 511:7-16). It was not necessary to rely on evidence

presented in Charles Small's defense to make this point.

      Viewing the Commonwealth's conduct in context and in light of the entire trial, the

Court cannot conclude that it "so infected the trial with unfairness as to make the resulting

conviction a denial of due process." *See Donnelly*, 416 U.S. at 643. Because the

underlying due process claim lacks merit, there is no basis for finding that trial counsel or

direct appeal counsel were ineffective for failing to raise it. *See Werts*, 228 F.3d at 202.

      The Court will deny Petitioner's request for an evidentiary hearing. (Doc. 36 at

67-68). The only facts Petitioner seeks to prove that are not already in the record concern

the existence of an agreement between the Commonwealth and Charles Small and that

Petitioner's trial counsel had no strategic reason for failing to object to the evidence offered

by Charles Small.  (*See* PCRA Proffer at 20-25).  Even if true, these facts would not

establish that Petitioner was prejudiced to the extent that any misconduct "so infected the

trial with unfairness as to make the resulting conviction a denial of due process."  *See*

*Donnelly*, 416 U.S. at 643.  Because facts Petitioner seeks to prove would not entitle him to

federal habeas relief, the Court must deny a hearing.  *See Landrigan*, 550 U.S. at 474.

    For the foregoing reasons, the Court will deny relief on Claim IV.C

### 4.    Claim X – Improper admission of Sussman evidence

    Claim X.A alleges that the trial court violated Petitioner's right to due process by

admitting the Sussman evidence.  (Doc. 1 ¶¶ 286-92).  Claim X.B alleges that trial counsel

were ineffective because they did not make sufficient efforts to limit the prejudice of the

Sussman evidence at trial and that direct appeal counsel was ineffective for failing to raise

the issue on direct appeal.  (*Id.* ¶¶ 293-99).

    On PCRA appeal, the Pennsylvania Supreme Court held that direct appeal counsel

was not ineffective for failing to raise trial counsel ineffectiveness because trial counsel

acted reasonably under the circumstances and there was no reason to believe that the jury

disregarded the trial court's instruction not to consider the Sussman evidence as evidence

of guilt.  *Small-II*, 980 A.2d at 567-68.

    For the reasons discussed below, the Court concludes that the claims lack merit.

Therefore, it is unnecessary to address AEDPA deference.  *See Berghuis*, 560 U.S. at 390.

The Court finds that the due process claim lacks merit for essentially the same reasons discussed in connection with Claim IV.C in the previous section.  The same due process standard applies to the trial court's admission of the Sussman evidence, requiring Petitioner to demonstrate that it "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994) (quoting *Donnelly*, 416 U.S. at 643).

Petitioner argues in connection with this claim the trial court's initial instruction on consciousness of guilt was confusing, but he does not offer any reason to disregard the presumption that the jury followed the trial court's subsequent directions to disregard the initial instruction. (*See* Doc. 36 at 121); *see Glenn*, 743 F.3d at 407.  Petitioner also contends that the corrective instruction was inadequate because it told the jury not to consider the Sussman evidence as propensity evidence but also stated that it was offered "to show the context of the other testimony that arose at that time." (*See* Doc. 36 at 121 (quoting NT Trial at 1510:5-7)).  The trial court's apparent intent was to allow the jury to consider the Sussman evidence for the purpose of deciding whether the "other testimony" offered by Janice Small related to the Smith murder or the Sussman burglary.  Absent any reason to believe that the jury would have understood it could use the evidence for any other purpose, the Court cannot conclude that the Sussman evidence "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Romano*, 512 U.S. at 12 (quoting *Donnelly*, 416 U.S. at 643).

Petitioner also asserts that the Sussman evidence was irrelevant to sentencing and the trial court's instruction incorporating the guilt phase evidence into the penalty phase violated the Eighth Amendment and his right to due process.  (Doc. 1 ¶¶ 291-92; Doc. 36 at 121-22).  Petitioner offers little analysis in support of this aspect of his claim or reason to believe that there is any likelihood that the jury would not have returned a death sentence if it had not heard the Sussman evidence.  The penalty phase instructions "did not offer the jurors any means by which to give effect to" the Sussman evidence.  *See Romano*, 512 U.S. at 13.  The instructions explicitly limited the jury's consideration of aggravating factors to the two alleged by the Commonwealth and only permitted the jury to use evidence admitted in the guilt phase "that bears on the enumerated  aggravating factors or you find provides any mitigating circumstances."  (NT 5/28/96 at 102:16-19, 103:7-20, 104:8-17).  Moreover, in view of Petitioner's waiver of his right to present mitigating evidence at the penalty phase and counsel's failure to present any argument against a death sentence, the Court is unpersuaded that the Sussman evidence, even if considered by the jury, so infected the penalty phase with unfairness as to render jury's imposition of death penalty a denial of due process or a violation of the Eighth Amendment.  *See Romano*, 512 U.S. at 12.

Because the Court has concluded that the underlying due process and Eighth Amendment claims lack merit, there is no basis for finding that trial or direct appeal counsel were ineffective.  *See Werts*, 228 F.3d at 202.

The Court will deny Petitioner's request for an evidentiary hearing because the facts he seeks to prove would not entitle him to federal habeas relief. (*See* Doc. 36 at 118-19; PCRA Proffer at 20-25); *see Landrigan*, 550 U.S. at 474.

For the foregoing reasons, the Court concludes on de novo review that Petitioner's claims lack merit. The Court will deny relief on Claim X.

### 5.    Claim XVIII – Inconsistent theories

Claim XVIII alleges that the Commonwealth violated Petitioner's right to due process and a reliable sentencing determination under the Eighth Amendment by taking the position that Charles Small's alibi was valid for the purpose of convicting Petitioner and then later prosecuting Charles Small for perjury after police identified new witnesses who stated that he was at the Pines on the night of Smith's murder. (Doc. 1 ¶¶ 430-39).

On PCRA appeal, the Pennsylvania Supreme Court addressed this claim as follows:

> [Petitioner] argues the Commonwealth's reliance on contradictory theories of whether Charles Small was involved in the murder violated his due process rights. The Commonwealth charged Charles Small in relation to the Smith murder. Before the case was submitted to the jury, the Commonwealth conceded Charles Small's alibi that he was in Florida when the murder occurred was supported by documentary evidence. After trial, the Commonwealth charged Charles Small with perjury and false swearing, believing his alibi was untruthful. Those charges were apparently dismissed on collateral estoppel and statute of limitations grounds. *See* [Petitioner's] Brief, at 120 n.51. The Commonwealth believed Charles Small was involved in the Smith murder; when the evidence at trial verified his alibi, the Commonwealth conceded as such. After trial, when the Commonwealth thought Charles Small lied concerning his alibi, it sought to prosecute him for that. The Commonwealth merely attempted to follow the evidence and act accordingly. Finally, [Petitioner] does not show how the Commonwealth's conduct before, during, and after trial concerning Charles Small so undermined

his trial and sentencing that those proceedings' outcomes would have been different. Accordingly, direct appeal counsel was not ineffective, and we affirm the PCRA court on this issue.

*Small-II*, 980 A.2d at 578. This is an adjudication of the merits of all of Petitioner's claims because the conclusion that the Commonwealth's conduct was not improper or prejudicial disposes of both ineffective assistance and the underlying due process claim. Therefore, AEDPA deference applies.

The Court concludes that there is no basis for disturbing the Pennsylvania Supreme Court's decision because Petitioner has not established a factual or legal basis for his claim. The Pennsylvania Supreme Court recognized that the Commonwealth's consistent theory of the case against Petitioner was that "he acted in concert with others." *Id.* at 560; *see also id.* at 578. The inconsistent theories only concerned whether Charles Small was present at the Pines and was one of the "others" who acted in concert with Petitioner. The substantial evidence against Petitioner, most notably his "numerous statements admitting to the killing," *id.* at 560 (quoting *Small-I*, 741 A.2d at 672), was unaffected by the inconsistencies in the Commonwealth's case against Charles Small. Therefore, Petitioner has not shown that those inconsistencies undermined the fairness of his trial.

In addition, Petitioner has not shown that the Pennsylvania Supreme Court's decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under § 2254(d)(1), "clearly established Federal law" refers to "the holdings,

as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.  The Supreme Court has explained that, when it "relies on a legal rule or principle to decide a case, that principle is a 'holding' of the Court for purposes of AEDPA." *Andrew v. White*, 145 S. Ct. 75, 81 (2025) (citing *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)).

Contrary to the conclusory assertions in Petitioner's supporting brief (Doc. 36 at 199-204), the Supreme Court decisions upon which he relies (*Berger v. United States*, 295 U.S. 78, 88 (1935), *Bradshaw v. Stumpf*, 545 U.S. 175 (2005)), are not "clearly established Federal law, as determined by the Supreme Court" that supports his position.  Neither *Berger* nor *Stumpf* reflects a "holding" of the Supreme Court that the prosecution's use of inconsistent theories violates the Due Process Clause.

In *Berger*, the Supreme Court held that a new trial was required because the prosecutor committed misconduct during cross-examination and closing argument that was "pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Berger*, 295 U.S. at 89.  *Berger* did not address inconsistent theories and thus, as lower federal courts have recognized, it provides no "clearly established Federal law, as determined by the Supreme Court" to support a claim based on inconsistent theories.  *See Littlejohn v. Trammell*, 704 F.3d 817, 854 (10th Cir. 2013); *Fotopoulos v. Sec'y, Dep't of Corr.*, 516 F.3d 1229, 1235 (11th Cir. 2008).

In *Stumpf*, the Supreme Court addressed a case involving the prosecution's use of inconsistent theories but did not hold that such conduct violated the Due Process Clause. *See Stumpf*, 545 U.S. at 186-87.  The case concerned the prosecution of two accomplices, Stumpf and Wesley, for the shooting death of a woman during a robbery in her home. *Id.* at 178.  Stumpf pled guilty to aggravated murder and was sentenced to death following a sentencing hearing at which the State argued that Stumpf shot the victim and that his primary role in the murder warranted a death sentence. *Id.* at 179-80.  The State later tried Wesley and argued that he should be sentenced to death as the principal offender, based on new evidence that Wesley admitted shooting the victim. *Id.* at 180.  The Sixth Circuit set aside Stumpf's guilty plea and death sentence on the ground that his due process rights were violated by the State's "'deliberate action in securing convictions of both Stumpf and Wesley for the same crime, using inconsistent theories.'" *Id.* at 182 (citation omitted).

The Supreme Court reversed in part, holding that the Sixth Circuit was "wrong to hold that prosecutorial inconsistencies between the Stumpf and Wesley cases required voiding Stumpf's guilty plea." *Id.* at 186-87.  The Court reasoned that "the precise identity of the triggerman was immaterial to Stumpf's conviction for aggravated murder," *id.* at 187, because Stumpf could be convicted of aggravated murder for aiding and abetting with the specific intent to cause death, without any showing that he had himself shot the victim, *id.* at 184.  The Court also noted that Stumpf "has never provided an explanation of how the

prosecution's postplea use of inconsistent arguments could have affected the knowing, voluntary, and intelligent nature of his plea." *Id.* at 187.

The Court vacated the portion of the judgment relating to the death sentence and remanded for further consideration. *Id.* at 188. The Court explained that "[t]he prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence, . . . for it is at least arguable that the sentencing panel's conclusion about Stumpf's principal role in the offense was material to its sentencing determination." *Id.* at 187. Because the case had been largely focused on the validity of the conviction, the Court concluded that "it would be premature for this Court to resolve the merits of Stumpf's sentencing claim, and we therefore express no opinion on whether the prosecutor's actions amounted to a due process violation, or whether any such violation would have been prejudicial." *Id.* at 187. In a concurring opinion, Justice Thomas stated that "[t]his Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." *Id.* at 190 (Thomas, J., concurring).

As is evident from the above discussion, *Stumpf* does not hold that inconsistent theories violate the Due Process Clause. Petitioner's conclusory reference to *Stumpf* simply notes, without analysis, that the Supreme Court "remanded for the Sixth Circuit to determine whether the 'prosecutor's use of allegedly inconsistent theories ... about Stumpf's principal role in the offense was material to [the] sentencing determination.'" (Doc. 36 at 201 (quoting *Stumpf*, 545 U.S. at 187)). The Supreme Court's statement on this point is

dicta, rather than "a 'holding' of the Court for purposes of AEDPA." *See Andrew*, 145 S. Ct. at 81.  Moreover, even assuming *arguendo* that this dicta could be read to suggest that inconsistent theories concerning a material issue might violate the Due Process Clause, the facts of Petitioner's case are readily distinguishable from those in *Stumpf*.  Unlike in *Stumpf*, the Commonwealth did not argue that Petitioner and Charles Small should each be sentenced to death based on materially inconsistent theories as to which of them was the principal offender who caused the death of the victim.  The inconsistencies in the Commonwealth's theory only concerned whether Charles Small was involved in Smith's murder at all, an issue that was not material to Petitioner's conviction or sentence.  Thus, the dicta in *Stumpf* that Petitioner relies on would afford him no basis for relief.  For these reasons, the Court cannot conclude that the Pennsylvania Supreme Court's rejection of Petitioner's due process claim is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).

Petitioner was granted leave to file a supplement to the instant petition that adds factual allegations in support of Claim XVIII based on information obtained in discovery. (Doc. 94-2 ¶¶ 24-56).  Petitioner alleges in the supplement that the police investigation from 2002 to 2004, which was conducted in preparation for retrying Frey, reflects a search for new evidence and new theories that "only confirms the lack of reliable evidence of [Petitioner's] guilt." (*Id.* ¶ 56).  The Commonwealth argues that Petitioner has not